## HOOKER & WOODWARD *vs.* VANDEWATER.

The proprietors of five several lines of boats engaged in the business of transporting persons and freight, on the Erie and Oswego canals, entered into an agreement among themselves to run for the remainder of the season of navigation at certain rates for freight and passage then agreed upon, but which were to be changed whenever the parties should deem it expedient, and to divide the net earnings among themselves according to certain proportions fixed in the articles. In an action on the agreement against a party who had failed to make payment according to the contract; *held* that the agreement was a conspiracy to commit an act injurious to trade, contrary to 2 *R. S.* 691, § 8, and was illegal and void.

MOTION to set aside the report of a sole referee. The action was assumpsit upon a written agreement, dated August 1, 1842, executed by the plaintiffs and the defendant and by several other parties, all proprietors of forwarding lines on the Erie and Oswego canals. It commenced by setting forth that " the undersigned forwarders on the Erie and Oswego canals, [the proprietors of each line forming a party to this instrument,] *for the purpose of establishing and maintaining fair and uniform rates of freight, and equalizing the business among themselves, and to avoid all unnecessary expense in doing the same,* do hereby respectively agree to and with the other, and each with all the others," " to *stock* all the earnings of freight and passage of all the parties hereto during the remaining season of canal navigation of 1842, in manner hereinafter contained, and to divide the same once a month into equal shares or parts, of which the Troy and Oswego line shall have twenty-one

shares; the Oswego line, twenty shares; the Oswego and Troy line, sixteen shares; the New-York, Utica and Oswego line, eight shares; and F. J. Littlejohn's line, four shares." It goes on to provide " for carrying the provisions of the agreement into full effect," that each party should deposit with C. S. Douglass $35 per share to enforce due returns, and to liquidate the balances which might be found on the monthly settlements afterwards provided. Any party failing to make returns, afterwards provided for, was to forfeit his deposit to the other parties, and if all the parties should make returns, the deposit of each party was subject to be paid over to satisfy any deficiency of such party appearing upon the returns, and then he was to fill up the deposit anew to the original amount. D. K. Neal was appointed the agent of each party and of the association, and was to keep an office in Troy; and to him each of the parties was to make weekly returns of all the freight and passengers carried by such party, which freight was to " be computed on such returns at such rates of transportation as this association had established for the time," and the bills of lading and other documents were to be produced to enable the agent to test the accuracy of the returns. Once a month the agent was to take up all the returns, and to deduct from the gross amount of the freight and passage money of each party the tolls on the same and on the boats run, and also fifteen cents per mile on every mile run by each boat, without reference to cargo, and at the rate of ten cents per mile on every mile each boat has run for every forty tons of. down freight transported, " and the residue remaining to each party, after such deductions, shall be added together, and the sum total divided into equal shares or parts and proportioned among the several parties hereto according to their relative number of shares as herein before stated." Each party was to do his proportion of business according to his number of shares, " if they can obtain the same at the prices adopted by this association, and keep in readiness a proportionate number of boats if necessary. The parties hereto shall at once establish rates of freight and passage to govern the association, which rates so established shall be signed by the parties

*in interest and be conclusive,*" but this list of prices was to be changed whenever the parties should deem it expedient. Existing contracts by either of the parties for freighting for the season were to be returned and estimated at the rate specified in such contracts, and it was stipulated that nothing contained in the agreement should constitute the parties partners. The agreement was signed as follows : "Bronson & Crocker for the Troy and Oswego line ; R. J. Vandewater [the defendant] for the Oswego line ; James C. Woodward for the Oswego and Troy line ; H. C. Rosseter for the New-York, Utica and Oswego line ; R. J. Vandewater [the defendant] for Littlejohn's line." There was a list of prices attached to the agreement, signed by the parties.

The declaration averred that the plaintiffs (Hooker & Woodward) were partners transacting business under the name of the Oswego and Troy line ; and that Neal, the agent, on the 20th of December, 1842, made up the accounts from the respective returns of the parties, stating the same and making the deductions according to the terms of the agreement, and dividing the residue according to the proportions mentioned therein, and that thereby there was found due from the defendant to the plaintiffs the sum of $1425,32, the balance of which, after deducting what had been paid to the plaintiffs out of the money deposited, they claimed to recover against the defendant.

*Non-assumpsit.* was pleaded, and on the trial before the referee the execution of the agreement was proved together with the list of prices annexed, and it appeared that Woodward executed the papers on behalf of the plaintiffs who were partners. It was proved that the parties made their deposits with Douglass as provided by the agreement, and Neal, the agent, proved that they acted under the agreement and made their returns to him ; and that from those returns he had made out a statement, which was produced, showing the defendant as the proprietor of the Oswego line and Littlejohn's line deficient in the sum of $1566,82, of which $1425,32 belonged to the plaintiffs as the proprietors of the Oswego and Troy line, according to the provisions of the agreement, and the residue to

other parties.   It was shown that the plaintiffs had received $682,27 of the deposit money, leaving a balance of $743,05, which, with the interest thereon, the referee reported in favor of the plaintiffs against the defendant.

*S. Stevens,* for the defendant, among other points insisted that the agreement on its face showed an unlawful combination to raise and keep up the price of transportation on the canals, to the injury of trade and commerce, and that it was therefore void.   He cited *The People* v. *Fisher,* (14 *Wend.* 9, 15.)

*C. P. Kirkland,* for the plaintiffs.

*By the Court,* JEWETT, J.   It is a general proposition that an agreement to do an unlawful act cannot be supported at law—that no right of action can spring out of an illegal contract; and this rule applies not only when the contract is expressly illegal, but whenever it is opposed to public policy, or founded on an immoral consideration—the maxim being *ex turpi causa non oritur actio.*   (1 *Sel. N. P.* 63, 10*th ed.   Chit. on Cont.* 657, *ed.* 1842.)   A court of law will not lend its aid to enforce the performance of a contract which appears to have been entered into by the contracting parties for the express purpose of carrying into effect that which is prohibited by the law of the land.   (*Holman* v. *Johnson, Cowp.* 341 ; *Jackson* v. *Duchaise,* 3 *Tenn. R.* 551; *Duvergier* v. *Fellows,* 5 *Bing.* 248.)

The revised statutes provide, that "If two or more persons shall conspire, to commit any act injurious to trade or commerce, they shall be deemed guilty of a misdemeanor." (2 *R. S.* 691, § 8.)   The object of the agreement made between the parties to the contract, upon which the action in this case is founded, as expressed upon its face, was *to establish and maintain fair and uniform rates of freight, and to equalize the business of forwarding on the Erie and Oswego canals, among themselves, and to avoid all unnecessary expenses in doing the same,* for a limited period.   The parties respectively owned and were then using distinct lines fitted up for carrying

on that business, independently of and disconnected with each other. To accomplish their object they agreed, in effect, that each party should run his line of boats upon these canals during the period of canal navigation in 1842, at rates of freight fixed by themselves, from which neither should deviate; and to indicate the interest of each, the respective lines were converted into stock, in all amounting to sixty-nine shares. They were to share equally in the net earnings of all the lines in propor tion to the number of shares of such stock; and to enforce a due performance of the contract a common agent was constituted, to whom each was to advance and keep good $35 on each share of such stock, and who was, from time to time, to receive from each returns of the business done by each line, and adjust the proportions from the earnings due to each, and out of this common fund to pay and liquidate all such sums as should appear from time to time to be due from one to the other.

The object of this combination was obviously to destroy competition between the several lines in the business engaged in. It was a conspiracy between the individuals contracting, to prevent a free competition among themselves in the business of transporting merchandize, property and passengers upon the public canals. The question arises, is such a conspiracy to commit such an act "injurious to trade or commerce," within the meaning of the statute, and therefore illegal? The words *trade* and *commerce* are said by Jacobs, in his Law Dictionary, not to be synonymous; that commerce relates to dealings with foreign nations; trade, on the contrary, means mutual traffic among ourselves, or the buying, selling or exchanging of articles between members of the same community. That the raising of the price of freights for the transportation of merchandize or passengers upon our canals is a matter of public concern, and in which the public have a deep interest, does not admit of doubt. It is a familiar maxim, that competition is the life of trade. It follows, that whatever destroys, or even relaxes, competition in trade, is injurious, if not fatal to it. (*The People* v. *Fisher*, 14 *Wend.* 9.) The object of the agreement, as expressed in the written contract, was plausible enough; but it is

impossible to conceal the real intention. It is evident that the parties were the owners of five separate and powerful lines of boats, provided for the transportation of property, merchandize and passengers on the canals, then in use and in active rivalry in the business, affecting more or less the price of freights; to destroy which rivalry and keep up the price to certain rates fixed by themselves, was the great, if not the sole object of that agreement. The transaction amounted, as I think, to a conspiracy to commit an act " injurious to trade," within the legal meaning of the statute denouncing it as a crime, and was therefore illegal and void. The report of the referee cannot be allowed to stand.

Report set aside.