Patterson, J.
Upon the application of the plaintiffs, ajiemporary injunction was granted in this action by the presiding justice, restraining the defendants, until the further order of this court, from doing, or causing, or permitting to be done, any act or thing on behalf of the Oregon Railway & Navigation Company, in opposition to or in violation of a certain instrument called a “joint lease, ” mentioned in the affidavit presented on the application; and from aiding and abetting, or in any wise promoting, a certain suit pending in a court in the state of Oregon in which an injunction had been issued, interdicting, in effect, the execution and delivery of such joint lease by the Oregon Railway & Navigation Company; and from building and encouraging, or permitting the building, of branch lines or railways in Oregon, and in Washington and Idaho territories; and from continuing the building of a bridge then in the course of construction over the Snake river, at the town of Riparia, in Washington Territory; and particularly from using the proceeds of any consolidated bonds of the Oregon Railway & Navigation Company theretofore sold, or which were then on deposit in the Farmers’ Loan & Trust Company of the city of New York; and from withdrawing funds from the said trust company; and from using any of the funds, property, or resources, of the Oregon Railway & Navigation Company for the construction of the bridge and branch lines referred to; and from building any branch lines or extensions without first obtaining the consent of the stockholders of the Oregon Railway & Navigation Company. Other things, set forth witli considerable detail and particularity, but not requiring further mention here, are also prohibited, and the present motion is to continue the injunction in force until final judgment. The order of injunction was granted oil an affidavit of the plaintiff Brayton Ives, but permission was given to serve other affidavits in support of the order, of which permission the plaintiffs have liberally availed themselves. No complaint has been filed, and the multifarious and complicated facts have been gathered from a great mass of affidavits, documents, and other exhibits, injected into the case, with but little attention to an orderly or coherent arrangement.
What ultimate relief the plaintiffs seek is not stated in any concise form, but it is assumed that it is substantially the same as that constituting the restraining provisions of the injunction order, with such modifications of those provisions as may be necessitated by the variations of fact established by the-opposing affidavits. The object of the action may therefore be stated to be to-perpetually enjoin the defendants from building the bridge over the Snake river at Riparia, and from constructing or aiding in the construction of the three branch lines of railway, or any other branch lines of railway, and from using the proceeds of the consolidated mortgage bonds mentioned in |he injunction order for either of the purposes above stated. The action is brought, by shareholders of the Oregon Railway & Navigation Company, a corporation, of the state of Oregon, suing on behalf of themselves and all other shareholders of that company who may unite in the action. The plaintiff Ives, and all the individual plaintiffs except Colby, are residents of the state of New York. These resident plaintiffs own 4,635 shares of the company’s stock, and Colby is the owner of 50 shares. The plaintiff the Oregon & Transcontinental Company is a corporation organized under the laws of the state of Oregon, and is the owner of 117,827 shares of the stock of the Oregon Railway & Navigation Company. The plaintiffs together hold and own more than one-half of the capital stock of the last-named company. The individual defendants-were, at the time of the commencement of this action, directors of the Oregon-Railway & Navigation Company, and that corporation is joined with them as- *647 a defendant on the record. The defendant Elijah Smith is the president, and the defendant Prosper W. Smith the treasurer, of the company, which has its principal office for the transaction of its financial business in the city of New York, and its officers above named reside in that city. Six of the directors of the company are residents of the city of New York, and constitute an executive committee of the board, and as such transact certain business of the company in the city of New York. A majority of the directors reside in Oregon. The suit is, in substance, one to restrain action on the part of directors, and to compel the observance of agreements of the corporation; the claim of the plaintiffs being that the defendant directors, in violation of their duty, of the contracts and binding covenants of the company, and of the rights of its shareholders, have begun, and unless enjoined intend to complete, with moneys of the company, which are not applicable to such purposes, the construction of the bridge and of the branch roads, and that if allowed to proceed great and irreparable injury will be inflicted upon all the the shareholders, and that in the matters sought to be enjoined the directors are acting in the interests of other corporations.
The Oregon Bail way & Navigation Company is the owner of lines of railway in the state of Oregon, and in the territories of Washington and Idaho. Its main line extends from the city of Portland, in Oregon, its western terminus, in a direction generally eastward, to Umatilla junction, from which point it proceeds in two directions,—one (generally) southeasterly, to the town of Huntington, in Oregon, and the other northeasterly, to Walla Walla, in Washington Territory; and thence (generally) north to Biparia, the point on the Snake river at which the bridge is being built. The Northern Pacific Bailroad Company, a corporation organized under a statute of the United States, owns and operates a line of railway which traverses in an irregular course, approaching them from the east, portions of the territories of Idaho and Washington, to the town of Tacoma, on Puget’s sound; and also a line from Wallula, along the valley of the Columbia river, in Oregon, to Portland. This company’s lines are located, and it operates in, what may be termed, for the purposes of this case, territory situated to the north of the line of the Oregon Bail way & Navigation Company’s road. The Oregon Short-Line road is a corporation organized under a statute of the United States, and owns a line of railway extending in a general direction easterly from the town of Huntington to Oregon, until it makes a junction with the Union Pacific Bail-road, which is owned by a corporation also organized under a statute of the United States. The territory traversed by these two roads may, for the purposes of this case, be described as situated to the south of that occupied by the Oregon Bailway & Navigation Company. This statement of the locations of the several roads isonothing but the merest general reference thereto, but is sufficient to indicate the relative situation of the country occupied by each line.
In April, 1887, the Oregon Bail way & Navigation Company leased its road for a term of 99 years to the Oregon Short-Line Company, and the Union Pacific Company guarantied the performance of all the covenants and stipulations of the lease, which, by its terms, was to be considered as having gone into effect on the'1st day of January, 1887. It was made by the directors with the express assent of the stockholders of the Oregon Bailway & Navigation Company. The Short-Line road was under the control of, and was operated by, the Union Pacific Company; and upon the execution of the lease referred to the Union Pacific Company came into the possession of a direct line over its own road and that of the Short-Line and that of the Oregon Bail-way & Navigation Company, from its eastern terminus, on the Mississippi river, to Portland, in Oregon. From the inception of these several railway enterprises the subject of the territory to be occupied or traversed by their respective lines has been of serious concern to all interested, and it appears to *648 be uncontradicted that it was desired that the location of two of the great lines of railway should be such as not to conflict with each other by operating in what would be substantially the same territory. To accomplish this, so far as the Northern Pacific and Oregon Railway & Navigation Companies were concerned, certain agreements were made between those companies, in 1880 and 1882, to which a more particular reference will be required hereafter; and further to promote the same object, (among other things,) after the execution of the lease of the Oregon Railway & Navigation Company to the Short-Line Company, and in January, 1888, an agreement was contemplated, and the terms settled and embodied in a written instrument to be executed by the four companies, which written instrument is that called in the injunction order the “joint lease.”
There are three features of the lease of the Oregon Railway & Navigation Company to the Short-Line Company which are important in this ease. It contains a recital to the effect that the first-named company has entered into certain traffic contracts with the Northern Pacific Railroad Company, dated October 20, 1880, and August 17, 1882, and the Short-Line Company accepts the lease “subject to all the valid covenants and agreements” with the Northern Pacific Railroad Company. The lease also refers to certain consolidated mortgage bonds which the Oregon Railway & Navigation Company was or would be entitled to issue, and that company agrees to deliver to the Short-Line Company all these consolidated mortgage bonds (among other things) to pay for the construction of branch lines, and to provide funds for the construction and equipment of railroad lines in the state of Oregon, and in Washington, Idaho, and Montana territories, connecting or intending to connect with the system of the Oregon Railway & Navigation Company, and under certain conditions; and it also provides that branch lines may be built “ with the express consent and approval of the board of dijrectors of said Oregon [Railway & Navigation] Company first had and obtained. ” The agreements of October 20, 1880, and August 17, 1882, between the Oregon Railway & Navigation Company and the Northern Pacific .Railroad Company provide with great detail for an interchange of business, ibut they also have in view the objects expressed in the following provisions -of article 3, § 3, of the first-named agreement, viz.: “That the Pacific Company, its successors or assigns, shall not construct or operate, or cause to be constructed or operated, or aid in or encourage the construction or operation of, any branch or other railroad south of the Snake river, except its main line as aforesaid, nor south of the Columbia river, between the crossing of said river by its main line, in the vicinity of Wallula and The Dalles; and that the Oregon Company, its successors and assigns, will not construct or operate, or cause to be constructed or operated, or aid in the construction or operation of, any branch or other railroad north of the Columbia river, or of the Snake river, excepting only” a certain branch, which seems afterwards, and by the agreement of August 17, 1882, to have been abandoned. So far as the building of branch lines of railway is concerned, there is in this agreement a positive compact between the two corporations to abstain from what lias been called the invasion by one of the territory assigned to the other, not arbitrarily, but for the reasons which are recited in the contract of October 20, 1880, as follows: “In order that the said extensions or branches of the railroads of each of said corporations may be made and operated on a consistent plan, and to avoid the complications likely to follow attempts by either party to encroach upon or intermeddle with the business of the other, and in order that the public may be better served and better secured in the advantages of railway service, and that the business and affairs of the parties hereto, and their respective successors and assigns, may be more prudently and economically conducted and administered, for their own benefit and that of the public.” At tlie time of the execution of the lease to the Short-Line Company negotiations *649 were pending with the Northern Pacific Company looking to its becoming a party to a lease of the Oregon Railway & Navigation Company’s road. These negotiations were continued after April, 1887, and finally culminated in an arrangement being concluded among the four companies, by which the Northern Pacific Company was to become a joint lessee with the Short-Line Company of the Oregon Railway & Navigation Company’s road and property. The Northern Pacific Company was to be admitted to and was to enjoy equally with the Short-Line Company the benefit of the lease, and was to bear half its burdens; the Union Pacific Company maintaining its relation of guarantor. The terms of the arrangement were fully agreed upon, and, as before stated, were embraced in a carefully prepared written instrument, which was exe- • cuted by the Short-Line Company, the Union Pacific Company, and the Northern Pacific Company, but was not formally executed by the Oregon Railway & Navigation Company. It was given into the possession of the attorney of the latter company, but, before the directors and stockholders of that company could act upon it, its execution was enjoined by a court of the state of Oregon, at the suit of Mr. Delashmut, and it never has been executed. Subsequently to the Delashmut injunction the Union Pacific Company, in effect, withdrew its assent to the joint lease. Its board of directors passed a resolution reconsidering its action in executing the lease, and gave notice thereof to the Northern Pacific Company. This resolution was passed on the 2d day of June, 1888. The Oregon Short-Line Company adopted a similar resolution, and recalled its assent to and execution of the joint lease.
Among the provisions of the joint lease, and a prominent feature of it, is one relating to the division of territory in which branch lines or extensions of the Northern Pacific and of the Oregon Railway & Navigation Company's roads shall be built; and up to May, 1888, it is quite clear that the directors and officers of the Union Pacific and of the Short-Line Companies must have regarded the joint lease, and all its terms, with favor, and it was so regarded by the president of the Oregon Railway & Navigation Company, and by the directors of that company who resided in New York, and constituted the executive committee of the board. The provisions of the joint lease respecting the building of branches or extensions are, in substance, that the Northern Pacific Company shall have the exclusive right to build in territory north of the Snake river, (with an exception,) and the Oregon Railway & Navigation Company and the two other corporations in territory to the south. A more particular description is not necessary, for it is conceded that the bridge and proposed branch lines are in territory assigned by the traffic contracts and the joint lease to the Northern Pacific Company. After the repudiation by the Union Pacific and the Short-Line Companies of the joint lease, and the issuance of the Delashmut injunction, certain of the directors of the Oregon Railway & Navigation Company, with the concurrence and active co-operation of the president of the Union Pacific Company, and apparently at the instigation of that company, determined to construct two of the branch lines referred to in the moving papers, and to aid in the construction of the third, and to build the bridge over the Snake river at Riparia. To authorize this to be done, four of the members oí the executive committee of the Oregon Railway & Navigation Company signed a paper approving the routes, which paper was sent to the directors of the company resident in Oregon, who, at a meeting held May 31, 1888, passed a resolution authorizing and approving the construction of the bridge and branch lines at a total cost of $3,600,289. It also appears that at a meeting of stockholders of the Oregon Railway & Navigation Company held June 18, 1888, the action of the directors of the company from July 4, 1887, was approved by a general and sweeping resolution, but it does not appear in any way that the subject of the resolution of the directors of May 18, 1887, was mentioned or referred to at that stockholders’ meeting. Active 'work was afterwards begun on the bridge and branch lines, and the in june *650 tion now before the court was obtained to prevent its further prosecution,, and the application of the consolidated mortgage bonds, or their proceeds hereinbefore mentioned, to the payment of the cost thereof. The irreparable injury alleged is the squandering of the proceeds of the bonds in useless building, and the initiation of a war of construction between the two corporations.
From the foregoing very general outline of the leading facts of the case on. this branch of it, it will appear that from 1880 to May, 1888, it was the fixed and determined policy of the Oregon Railway & Navigation Company, and of' the Northern Pacific Company, fortified by as binding sanctions as agreements and proposed agreements could constitute, that there should be preserved to each road certain territory within which it should prosecute its work of extending its railway lines and business without interference with or molestation from the other? and it would seem to be also apparent that this was regarded as the dictate of wisdom in the proper and economical administration of these-respective lines. The terms of the joint lease recognize it, and they have been referred to as indicating that, up to the last-mentioned date, the same con- ■ viction as to the policy of building branches or extensions must have been held by the officers of the Short-Line and of the Union Pacific Companies. There-is another and distinct ground on which the plaintiffs claim their right to the injunction restraining the use by the defendant corporation and its officers of the proceeds of certain of the consolidated mortgage bonds, and that is that such proceeds are impressed with a trust prohibiting their use for building-any branches or extensions, except such as shall be assented to by the Northern Pacific Railroad Company. This claim may be disposed of in a few words. I think it established that Mr. Villard bought the bonds referred founder the belief and full expectation that the joint lease would be executed by the four corporations, and would become an operative instrument; but it. is not conclusively shown that the Oregon Railway & Navigation Company assented to the terms of the alleged trust, or became bound by it. Mr. Villard’s. statements and those of Mr. Colby are met by the opposing affidavits; but,, even if the agreement was made between Mr. Villard and Mr. Adams, as-stated by the former, the latter was not the agent or representative of the defendant corporation, and it cannot be bound by his acts or agreements, nor is the evidence of the knowledge of the executive committee of the terms of Mr. Villard’s purchase sufficient to bind the company to a trust limiting the use-of the funds. I think the trust feature must be eliminated from the ease.
The general grounds of opposition urged by the defendants to the continuance of the injunction may be summarized as follows: First, that this court has not jurisdiction of the action; second, that the plaintiffs, as stockholders, cannot maintain a suit for the relief here sought; third, that the joint lease-can not, in any of its terms, be enforced; fourth, that the traffic contracts between the Oregon Railway & Navigation Company and the Northern Pacific-Railroad Company, subject to the valid provisions of which the lease to the-Short-Line Company was made, furnish no ground for relief, because those-provisions which relate to the division of territory and the building of branch, lines are invalid at common law and under the interstate commerce act; fifth, that the building of the bridge and branch lines is within the powers of the directors of the Oregon Railway & Navigation Company, and such directors have specially authorized and approved the construction thereof, and their action has been sanctioned by the shareholders of that company; sixth, that no ' case has been made for an injunction on the merits, and that the building of the bridge and branch lines will not be detrimental, but beneficial, to the interests of the shareholders of the Oregon Railway & Navigation Company.
So far as the Oregon & Transcontinental Company is concerned, the court, might not have jurisdiction of an action brought by it alone for the relief ‘ asked in this suit. The significance attached to the attitude of that company/ *651 respecting the matters here involved, as the record now stands, is the support given by its indorsement of the suit, and its condemnation of the acts-sought to be enjoined,—a consideration which affects the equitable aspects of the case, as showing that those acts are obnoxious to and will not be ratified by the majority of the shareholders of the Oregon Kailway & Navigation Company. The jurisdiction of the courts of the state of Hew York over foreign corporations is one conferred by statute. By section 1780 of the Code of Civil Procedure, it is provided that an action against a foreign corporation may be maintained by a resident of the state or a domestic corporation for' any cause of action. Construction has been given to this provision by this-court, and, whatever might have been my own view of the proper interpretation of it, I am bound by that expressed in Prouty v. Railroad Co., 1 Hun, 658; and the authority of that case is conclusive upon me so far as this motion is concerned. That was a stockholder’s action against a foreign corporation, to compel the payment of dividends upon certain preferred and guarantied stock. It involved the ascertainment of rights under an agreement of a foreign corporation, and directly affected the acts of directors. The judgment restrained the application of dividends to common stock until the arrears of dividends on the preferred or guarantied stock of the corporation should be paid out of the net earnings of the company. In the case cited, that of Howell v. Railroad Co., 51 Barb. 378, so much relied on in the argument, was expressly overruled. Other actions against foreign corporations similar to the Prouty Case have been maintained, and notably that of Boardman v. Railroad Co., 84 N. Y. 157, which was described by the court as-being brought, “not to recover the dividends alone, but to compel the defendant to do what is necessary and proper for the specific performance of the contract and agreement entered into by the Michigan Southern & northern Indiana Bailroad Company in reference to the guarantied or construction stock issued by it;” and a decree enjoining the company from paying dividends on common stock until the holders of guarantied stock were all paid, and a requirement to pay the dividends on preferred stock, was upheld against the foreign corporation. The jurisdiction in that case does not seem to have-been questioned.
Of course, it is not to be understood that, even under the wide interpretation given to section 1780 of the Code, the courts of this state would exercise jurisdiction of every kind of action or suit brought by a resident against a-foreign corporation; for where only the mere internal affairs of the corporation, resting in the untrammeled discretion of its directors as its governing' or controlling agents are involved, or where the remedy sought can only be given by the courts of the sovereignity by which the corporation was created, or where a decree would be abortive, jurisdiction would be declined. But the-rule deducible from the cases is that the courts of this stale will entertain actions against foreign corporations, in favor of resident plaintiffs, not only to recover at law, but also in equity, including suits in favor of resident-shareholders, who have clear rights to be protected; and they will compel the-enforcement, by officers and directors of foreign corporations, if properly brought into court, of the contract obligations of the corporation, if the neglect or violation of such contract obligations amounts to a breach of trust or duty which will be productive of injury to such resident shareholders, in matters removed from the ordinary powers or discretion of such directors, and no-adequate remedy at law is available. In the case at bar some of the directors- and officers have been duly served with process, and they and the-corporation have appeared by attorneys in the action. The subject-matter of the controversy is the contracts and obligations of the defendant corporation, and there is a fund within the jurisdiction of the court, the use of which, in violation of the contracts, may be effectually enjoined, if, upon the whole case, the court shall find that the contemplated use is contrary to the duty of the directors, and would cause irreparable injury.
*652 The resident plaintiffs, as stockholders,' have, in my opinion, the right to maintain the action. The general nature of stockholders’ actions, and the .■grounds upon which they may be brought, were fully discussed upon the argument of this motion, and the American and English precedents were cited. It is not necessary to refer to them particularly. The leading cases in this •country, containing the most instructive commentary on the subject, are Dodge v. Woolsey, 18 How. 331, and Hawes v. Oakland, 104 U. S. 450. A useful case is also Dunphy v. Association, 146 Mass. 495, 16 N. E. Rep. 426, the opinion in which has appeared since the argument of this motion. There are expressions in the books, particularly in the English cases, which give force to the view that the acts of directors will not be restrained by a -court of equity unless such acts are ultra vires, or are fraudulent in their •character or consequences; but the word “fraudulent” is very elastic, and has not been confined, by any case of controlling authority, only to acts involving turpitude or conscious moral delinquency. Fraud may be predicable of .gross neglect of duty, and the squandering of corporate assets may amount to fraud, and the arm of a court of equity should not be shortened to disable it from reaching such cases. It must be a very strong case, and a very clear •emergency, however, that would justify interference with the management •of the affairs of corporations. They cannot be administered by a court, and the ordinary remedy of dissatisfied shareholders is to remove the offending directors at the next election. As was well said in Dunphy v. Association, supra: “The court cannot interfere with the management of corporations in matters which are properly within their discretion, so long as their ■discretion is fairly exercised; and it is always assumed, until the contrary ■appears, that they and their officers obey the law, and act in good faith towards ■all their members. Even when their acts are ultra vires or otherwise illegal, •a complaining member must first seek his remedy within the corporation. The ■only exception to the rule that a stockholder must apply to the directors, and •also, if need be, to the corporation, for redress of a wrong done it, before he ■can sue in a court of equity for himself and in behalf of other stockholders, •is when it appears that such application would be unavailing to protect his rights, [citing the authorities.] That may happen when the directors themselves are the wrong-doers, or are in fraudulent combination with them, or when the corporation is controlled by them, or when it is necessary that action should be taken too speedily to leave time for a corporate meeting of stockholders.” In the case of Boardman v. Railroad Co., supra, the court referred'to the subject of judicial interference with the powers of directors of corporations and said: “ While, as a general rule, courts of equity will not exercise visitatorial powers over corporations, and its officers are the sole judges as to the propriety of declaring dividends, and in this respect the court will not interfere with a proper exercise of their discretion, yet, where the right to the dividend is clear, and fixed by the contract, and requires the directors to take action before it can be asserted by a suit at law, and a restraint ■by injunction is essential to maintain the right of the stockholder, the interposition of a court of equity is a proper exercise of its power, and should be upheld.” In Railway Co. v. Buller, 5 Eng. Ry. Cas. 211, Lord Chancellor ■Oottenham approved the course of the vice-chancellor, (Shadwell,) who .restrained certain acts within the powers of the directors of a corporation, until the sense of the body of the shareholders could be taken upon the subject •of the complainant’s grievance.
In the very nature of things, it is impossible to formulate a general rule tfor the guidance of courts upon this subject.- Each case must depend on its ■own circumstances, and whether the -restraint will be applied or withheld must rest largely in the sound judgment and discretion of the court whose power is invoked. But that the power exists and has been exercised cannot ■be controverted, and whether it is because of the courts affixing to the word “fraudulent” a definition broad enough to cover specific acts, or because it *653 bases its jurisdiction upon breaches of duty or any other ground, cannot be a matter of practical consequence in this action.
Upon examining the record in this case for the purpose of ascertaining the-exact situation of Ihe parties, it becomes manifest that the injunction cannot be maintained for the purpose of enabling the shareholders of the Oregon Railway & Navigation Company to take action for the establishment of rights under the joint lease, nor would the court be justified in continuing the restraint for the purpose of the submission to the shareholders of the question of the execution of the lease by that company. It is apparent from the facts before recited that, even if the stockholders of that company should unanimously require its execution, the instrument could not become operative or binding on the Short-Line and the Union Pacific Companies. It never became a completed instrument; it was never delivered as such; it was merely a contract in fieri; and before it could be completed the Short-Line and the-Union Pacific Companies annulled their consent, and gave notice of their retirement from it. It has no legal quality as an instrument under which rights have-accrued or can be claimed by either party. Each of the withdrawing corporations had its locus penitentice, and there is no power in this court to compel, the reeission of the resolutions of the two companies named, by which they reconsidered their action approving the instrument; and, further than this,, it is obvious, in the present condition of the case, that neither of those corporations will resume its former relationship, or the joint lease under its pres, ent terms. The usefulness of that instrument now is to show the views entertained by all the companies on the policy of building branches or extensions up to the time of the rejection of the joint lease, but it cannot of itself be made the basis of an injunction to preserve a contemplated situation, which' now cannot be established, as the case is presented on the papers before the court. The right to the injunction must therefore depend primarily on the-traffic agreements which are attacked on the two grounds before mentioned. The Short-Line lease was taken, subject to all the valid provisions of these traffic agreements, and those valid provisions are just as much part of the-terms of that lease as if they had been incorporated therein in totidem verbis. Are the stipulations as to the division of territory, and those relating to the building of branches or extensions, valid? It is very doubtful if the court, in a proceeding of this character, ought to undertake to pass upon this question. The proper parties are not before it. The Northern Pacific Company is entitled to be heard; and, while it may be said it can in nowise be bound by a determination in an action to which it is not a party, yet the fact of the subject having been passed upon adversely to it would place it at disadvantage. But, as this aspect of the matter has not been argued, I will pursue it no further, and assume that the determination of the question is proper and necessary here.
If these traffic contracts are illegal, they must be so either by their being in contravention of some dictate of public policy, or some provision of positive law. There are certain well-defined and well-understood canons of the law as to public policy, but whether particular contracts fall within the condemnation of these principles is often a difficult and delicate matter to decide. If a certain class of contracts has been held by competent authority to be against the settled policy of the state, all of a similar character would necessarily be construed in the same way; but a court should not stamp with invalidity contracts which have existed for years, and under which rights have been created and obligations assumed, without the clearest conviction that they come within the condemned or illegal class. The avoidance of-contracts on the ground that they are against public policy is reluctantly ordered by the courts, and there are many cases in which eminent judges have expressed their disapprobation of applying the general proposition to concrete cases on a mere seeming application. Among them is Richardson v. Mellish, 2 Bing. 229, in *654 which Best, J., says: “I am not much disposed to yield to arguments of public policy. I think the courts of Westminster Hall * * * have gone much further than they were warranted in going in questions of policy. * * * I therefore say it is not a doubtful matter of policy that will decide this, or that will prevent the party from recovering. If once you bring it t'o that, the plaintiff is entitled to recover. * * * I admit that if it be clearly put upon the contravention of public policy, the plaintiff cannot succeed; but it must be unquestionable,—-there must be no doubt.” And in the same case, Burrough, J.: “I, for one, protest, as my lord has done, against arguing too strongly upon public policy. It is a very unruly horse, and when •once you get astride of it you never know- where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail.” These observations are just as forcible now as when they were uttered, in the year 1824. Before a court will declare a contract void on the ground referred to, it ought to be thoroughly satisfied that some plain principle of policy is violated by that contract. Those in general restraint of trade, and not necessary for the protection of rights granted, are void, although the narrow and neighborhood rules of the old cases have been much relaxed, if not virtually destroyed, by the decision in Match Co. v. Roeber, 35 Hun, 421, affirmed, 106 N. Y. 473, 13 N. E. Rep. 419.
There are many cases in which a settled and defined policy has been established concerning illegal contracts between carriers of passengers or merchandise, such as the Canal Carrier Cases, 21 Eng. Law & Eq. 319; Hooker v. Vandewater, 4 Denio, 349; and in Railroad Co. v. Railroad Co., 3 Rob. (N. Y.) 411, and many others. The last-mentioned case was insisted upon -in argument as ruling this, but 1 cannot so regard it. The difference is wide .and striking. The contract of 1850, in that case, had for its direct effect, to destroy travel over particular routes, and to prevent the building of a railroad north of Granby, leaving that part of the country without any railroad facilities whatever. The most that can be claimed for the case is that corporations ■owning existing lines of- road cannot make agreements between themselves by which the public shall be deprived of means of travel or transportation, .and that contracts preventing competition between roads actually built and in operation, or contemplated to be built on fixed and determined routes, are against public policy, and void. But here the case is widely different, if I •correctly understand the facts. The Oregon Railway & Navigation Company .and the Northern Pacific Company have each the right to build branches in a . great and widely-extended territory, unsettled, remote, and undeveloped. The main lines of each company penetrate territory naturally tributary to them. From each of these main lines branches or extensions, from time to time, become necessary, as the progress and development of the country may require. Instead of engaging in a strife which may cripple both corporations, and obstruct the development of all the country through which the lines are to pass, they agree that each shall open up for the public certain parts of the country through which their lines are authorized to be built; that each shall pursue a plan harmonious and consistent with its own system, affording to the public means of communication and travel, the one north, and the other •south, of a certain line; that each may go on developing its enterprise, and providing for the public, within certain prescribed territory, without the constant necessity of anticipating or avoiding the effects of the action of the ■other. How does this course infringe a sound dictate of public policy? It rather tends to promote than to defeat the opening of new districts to travel and commerce. It does not deprive the public of an advantage, but tends to •secure it by leaving each company to the work of development in a certain district, without the necessity of confining itself to counteracting or countervailing the efforts of one to occupy a certain locality to the exclusion of the other.
*655 But, however all this may be, I am not prepared to hold that these traffic ■contracts are void on the ground claimed. Neither am I prepared to hold -that they are void as against the fifth section of the interstate commerce act. I do not see that that act has, either in terms or by necessary implication, .any effect upon existing contracts, or those made before its passage; but if, under the authority of the cases cited by the learned counsel for the defendant, it may have the effect of destroying the pooling features of the traffic ■ contracts, it cannot invalidate the other provisions. They are not incidents ■ of a pooling scheme. They are integral, substantive parts of the contracts, just as much as the release of the claim of the Northern Pacific Company for ■ compensation for the right of way is; and, if the interstate commerce act affects the case at all, it is only to the extent of impairing those relations which are formed by the pooling provisions. But I am not to be understood ■ as holding that even such is the effect of the act of congress on these contracts.
But it is contended that the directors of the Oregon Railway & Navigation ■Company had the sole power to pass upon the question of building the bridge and branches, and that the exercise of that power is subject neither to the ■ control or interference of the stockholders, nor of the court; that by the stat. utes of Oregon all the powers of the corporation are to be exercised by the ■ directors. I am not referred to cases in the Oregon courts giving construction to these statutes, but certain decisions of federal judges have been referred to in support of the contention. Opposed to them, however, as explaining what powers are to be exercised by or are vested in directors, where "the words of the charter are as broad as those of the Orégon statute, is the case of Railway Co. v. Allerton, 18 Wall. 233. It may be that if the matter arose as an original one, under the terms of the Short-Line lease, the directors of the Oregon Railway & Navigation Company would have the right to act without consultation with or control by the shareholders. I do not consider it necessary to dilate upon that point; ior the corporation, by its direct■ors, had, by the traffic agreements, already settled the matter of building branch lines in the territory north of the Snake river, and had bound the ■corporation. The Short-Line Company had put itself in the same position, with reference to that subject, and the shareholders had approved the Short-Line lease. The power to build branches or extensions at the request of the •Short-Line Company was therefore not absolutely within the control of the directors, for both they and the Short-Line Company were limited by the •agreements of the corporation, and the question is not as to chartered powers, but as to power to be exercised in view of the contracts of the company; and the question here is, have the stockholders the right to insist that the power be exercised within the terms of these contracts? What I conceive to be the most serious ground of objection to the continuance of the injunction is the alleged ratification by the shareholders, at their meeting of June 18, 1888, of the resolution of the directors of May 31, 1888, authorizing the 'building of the bridge and of the branch lines. If it were shown that that resolution had been read at the meeting, or that its purport had been made known, or if it had been stated that authority had been given by the directors for the work to be done, I should at once dissolve the injunction. Under such circumstances there would be acquiescence, and of course no ground of complaint. But it appears that none of the proceedings of the numerous directors’ meetings that were formally approved were read or made known, and it does appear that both Ives and Hoyt were misled at that meeting. Mr. Hoyt’s affidavit satisfies me that there was no such ratification by the stockholders as should be held on this motion to preclude them from maintaining this action.
The only topic remaining for consideration is, upon the papers now before •the court, have the plaintiffs made out a plain case of injury to be sustained *656 from the acts complained of, and shown the existence of an emergency which - requires the interposition of a court? By a “plain case” is evidently not meant one in which there is no denial of alleged wrong. It is not required ■ that there shall be an actual demonstration, but the fair test would be whether,. upon the whole case, the court will feel itself compelled by a strong preponderance of testimony to determine, as matter of fact, that the complainant’s • case has been established. Here, after a most careful and minute examination of all the affidavits, I am constrained to say that, as the case now stands,. I am satisfied the building of the bridge, and of the three extensions or branch lines, will be greatly injurious to the interests of the Oregon Railway & Navigation Company and its stockholders. The facts, as deposed to in the affida- ■ vits, force me to this conclusion. The variant opinions of interested parties ■ have not been regarded in reaching this result, but the specific facts stated in-Mr. Oakes’ affidavit are convincing, and they are not overcome by the defendants; nor is any adequate reason given for so sudden a change of policy and of views as those which the defendants now advocate. What has occurred to necessitate the subversion of the policy of years does not appear, unless it may be the hostile feeling of the community of Portland to the joint-lease. The building of Hunt’s road cannot account for it, for that work was-begun and was well known at the time the joint lease was agreed upon; and it does not appear that the Northern Pacific Company is the promoter, or is-aiding in the construction, of that road. The agreement between it and the-Hunt road does not seem to me tó be a sufficient reason to support the acts of the defendants complained of here. What immediate or prospective ad van- ■ tage is to be derive'd by the Oregon Railway & Navigation Company by building the bridge and branches has not been made apparent; but it is clear that millions of dollars of that company’s money would be spent, and, what is-worse, spent in what Mr. Adams has termed a “war of construction,” which he has characterized as a “folly almost amounting to a crime." It is not a. sufficient answer to this to say that the shareholders get all they are entitled to, viz., the rental of 6 per cent, upon their shares, and therefore they are not. injured. The lease may be terminated by default of the lessee, and it is plain< that the guaranty of the Union Pacific Company is a precarious security, especially in view of its relations with the government of the United States; and, provision is made in the Short-Line lease for the contingency of the invalidity of that guaranty being declared.
It would lead to too prolonged a discussion to go into a recital of all tliespecific facts which have compelled me to reach the conclusion I have arrived at in this matter. Suffice it to say, I think the plaintiffs have made out a case entitling them to the maintenance of this temporary injunction until the whole case can be presented and passed upon; the same being modified so as-to strike therefrom all restraint based upon the provisions respecting the joint-lease, and providing that the defendants, etc., be enjoined from building, or-aiding in building, the bridge or branch roads, and from using the consolidated bonds, or their proceeds, within the jurisdiction of the court, at the time the injunction was granted, for the purpose of such building, unless-with the consent of the shareholders of the defendant corporation, until the-further order of the court. It is unnecessary to state the precise terms now. The order will be settled on three days’ notice. The plaintiffs must at all times be ready to maintain the order. They must file and serve their complaint without delay, and must be prepared to try the case, when at issue, as soon as reached, and to argue any appeal that may be taken from the order to-be entered hereon at the next general term. The undertaking must also be increased. The amount of that filed is not sufficient. An additional one in-the sum of $75,000 will be required.