CHICAGO, M. & ST. P. RY. CO. v. WABASH, ST. L. & P. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. May 7, 1894.)

No. 289.

1. CONTRACTS—PUBLIC POLICY—POOLING RAILROAD BUSINESS.

An agreement between railroad companies, by the terms of which all their roads are to be operated, as to through traffic, as if "operated by one corporation which owned all of them," and which provides for an actual division of such traffic, and, where this is not done, for a division of the gross earnings thereof, the obvious purpose being to suppress or limit competition, and to establish rates without regard to their reasonableness, is contrary to public policy, and void.

2. SAME—ENFORCEMENT OF CONTRACT—PERFORMANCE ON ONE SIDE.

One party to such illegal agreement, claiming to have performed its part thereof, cannot maintain a suit to enforce division of earnings by another party thereto, the traffic not having been divided. Brooks v. Martin, 2 Wall. 70, distinguished. Central Trust Co. v. Ohio Cent. R. Co., 23 Fed. 306, disapproved.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

This was a suit by the Central Trust Company of New York against the Wabash, St. Louis & Pacific Railway Company and others to foreclose a mortgage on the property of the railway company. The Chicago, Milwaukee & St. Paul Railway Company filed an intervening petition for a claim under certain traffic contracts. Defendant railway company answered, and, on hearing, the petition was dismissed. The intervener appealed.

On December 5 and December 29, 1883, contracts providing, among other things, for a pooling and division of competitive traffic, were entered into by and between seven railroad companies, to wit, the Union Pacific, the Chicago, Rock Island & Pacific, the Chicago, Milwaukee & St. Paul, the Wabash, St. Louis & Pacific, the Chicago & Northwestern, the Chicago, St. Paul, Minneapolis & Omaha, and the Missouri Pacific. There were four contracts. The first was between the Union Pacific Railway Company, as party of the first part, and the Chicago, Rock Island & Pacific Railway Company, as party of the second part, and the Chicago, Milwaukee & St. Paul Railway Company, as party of the third part. The other three contracts admitted the other parties into the pool, and made some modifications and extensions of the original contract. The four contracts were in effect one, and will be so treated. The following are some of the material provisions of the contract:

The preamble declares the object of the contract to be to "make the railway system of the party of the first part substantially a part of the railway system of each of the other parties hereto, as to westward-bound traffic which will pass through Council Bluffs, in the state of Iowa, and each of the railway systems of the other parties substantially a part of the system of the party of the first part, as to east-bound traffic which will pass through the same place. * * * It is declared to be the purpose of the parties hereto by the execution of these articles, and the performance of the several covenants, promises, and agreements herein set out, to establish and operate through lines of railway, which shall connect, when the same can be done by a reasonably direct line through Council Bluffs, all points on the system of the party of the first part with all points on the several systems of the other parties (excepting the Kansas Division of the party of the first part and its railroads in the state of Kansas), including all extensions of the main lines, branches, and other railways mentioned in the preamble hereto, and all lines and branches which are now owned, controlled, or operated by either of the parties hereto in connection with any of its railways above mentioned, and which may be added thereto by construction, purchase, lease, or other-

wise, and to secure the operation of all of said lines as to such through traffic as they should be if operated by one corporation which owned all of them. * * *

"The party of the first part covenants, promises, and agrees with each and both of the other parties that it will, so far as it lawfully can, deliver to the railways of said other parties, at Council Bluffs, all eastward-bound through traffic which may be received by it for transportation to any point which can be reached with reasonable directness over any of the through lines composed of the railroads of two or more of the parties hereto passing through Council Bluffs, and that it will make all lawful and reasonable efforts to secure the transportation of all such through traffic which may be received by it for transportation over such through lines. It will divide all competitive through traffic which shall be transferred from its own railways to those of the other parties, as nearly as shall be practicable, into two equal parts, and transfer one of said parts to the railways of each of said parties for transportation to destination, or to the proper connecting line. * * *

"The rates which shall be charged for the transportation of through traffic over the through lines hereby established, for which provision has not been made in the preceding section, shall be fixed in the manner following: The established or current rate of the party of the first part, as per schedules hereto attached and made a part hereof, between the point at which traffic is received or to which it is destined and Council Bluffs, shall be added to the established or current rates of the parties of the second and third parts, as per schedules hereto attached and made a part hereof, between the points on their several lines at which such traffic is received or to which it is destined and Council Bluffs, and the sum of the two rates shall be the through rate: provided, however, that the rates upon all through traffic between competitive points which may be connected by a through line over the Northern Pacific Railroad shall be so adjusted that the rates between such points and all Chicago and Mississippi river points by way of Council Bluffs shall be as low as by way of St. Paul. * * *

."The through rates on east-bound through traffic over the lines hereby established may be reduced by the party of the first part, and the like rates on like traffic west bound may be reduced by the party of the second or third part, by whom it shall be delivered to the party of the first part, when such reduction shall be rendered necessary by competition with lines other than those hereby established. When any through rate is reduced by a party for any reason it shall immediately notify the other parties hereto of such reduction and the facts which it is claimed justified such reduction. A reduction of a rate shall continue only so long as shall be necessary because of competition. No rate shall be reduced by any party otherwise than as provided in this and preceding sections. * * *

"If any through rate shall be reduced by any party for reasons which are not satisfactory to the other parties, the rates fixed by the schedule shall be immediately restored, and maintained until a majority shall direct a modification, and all traffic transported under modified rate shall be accounted for at full rates in the division of the proceeds of the through traffic between the parties. In no case shall a schedule of rates be in any manner modified, altered, or reduced for the purpose of drawing traffic from the railways of any party hereto. If any party shall feel aggrieved because of any modification of any through rate, or of any order restoring a rate which has been cut, or by the action of any party tending to evade or in any wise impair agreed rates, the party so aggrieved may make it the basis of a complaint which shall be determined by reference as hereinafter provided. On the hearing of any such reference, the referees may affirm the order made by a majority of the parties, or direct the restoration of the rate reduced, and in a proper case make award to the party or parties injured by any evasion or unjustifiable reduction of a rate, as compensation for any damages which shall have been sustained. * * *

"If the east-bound competitive traffic actually transported by either of the parties of the second or third part, in any one month, shall not amount to the equal share to which it shall be entitled under the provisions of these articles, the balances shall be so adjusted as to give to each the proceeds of an equal

share of the gross revenue received by both for the transportation of such traffic. * * *.

"To prevent confusion in the settlement of accounts, the following distances are arbitrarily established: From Council Bluffs to all points east thereof which take Chicago rates, five hundred miles; from Council Bluffs to all points east thereof which take Mississippi river rates, three hundred and forty miles. * * *

"No covenant, promise, or agreement in said original articles or in these supplemental articles contained shall be so construed as to affect or control (otherwise than by securing equality of rates, as provided in said original and these supplemental articles) through traffic specially routed, marked, and consigned by the shippers over through lines of which the Southern Pacific Railroad does now, or shall hereafter, form a part; but the rates on all through traffic between competitive points which may be connected by a through line over the Southern Pacific Railroad shall be so adjusted that the rates between such points and all Chicago and Mississippi river points by way of the Southern Pacific shall be as high as by the way of Council Bluffs. * * *

"If, at any time while this contract remains in force, the construction of new railroads, or the extension of existing ones, or the purchase or lease of railroads, or traffic or other arrangements, made by any one or more of the parties hereto, shall materially change the relations now existing between the parties with regard to traffic, the contract set out in the original and in these supplemental articles shall be so modified, altered, and amended as to establish between them, with regard to the then existing circumstances, substantially the relations hereby established between them with regard to the circumstances now existing. It is declared to be the purpose and intent of the parties to maintain the relations hereby established with regard to existing railroads and operating and traffic arrangements, and to adjust such relations to any change which may be made therein with regard to through traffic. If the parties cannot agree upon the modifications, alterations, or amendments which shall be made, if any, under the provisions of this section, the difference or differences which may thereby arise shall be determined by reference as in the original and these supplemental articles provided. * * *

"Each party will contribute to a common fund all of the gross revenue which it shall receive for the transportation of both east and west bound through traffic, hereinafter described, to or from Council Bluffs, and to and from Missouri valley, in the performance of the covenants, promises, and agreements set out in said original and supplemental articles. For the purpose of ascertaining the full amounts of the gross revenue which the parties shall severally contribute, each shall account and pay for all through traffic, both east and west bound, so transported by it, as follows: For all through traffic, except lumber, between the said Union Pacific and the Sioux City Pacific Railways and the railways of other parties hereto covered by said original and supplemental articles, which shall originate at, be destined to, or cross the Mississippi river at any point between the cities of Dubuque and St. Louis, both inclusive, at the rates for like traffic between Chicago and Council Bluffs. Through traffic which shall be transported for the government of the United States shall be accounted for at the actual rates paid for the same; that is, the regular rate, less the discounts which may be made because of land grants. When a penalty is charged on traffic for excess of weights, such traffic shall be accounted for at the regular rates for actual weight. Each party shall deliver to each of the others quarter-monthly statements showing what through traffic covered by said original articles and the supplemental articles referred to has, during the quarter month immediately preceding, been transferred over its railroads, or any of them, in what it consisted, between what stations and in what directions it was transported, and the rates charged and received therefor.

"The party of the third part hereto undertakes to account to the other parties, and pay to the common fund, provided for in the second section hereof, at Chicago rates, for all through traffic which may be received on its line, which can be lawfully transported from the point at which it shall be re-

ceived to destination or the proper connecting railway, over any of the through lines by the original articles and the supplemental articles established, with reasonable directness, through Council Bluffs, though such traffic, or some portion thereof, may not have been so actually transported: provided, however, that no greater amount of traffic to or from California points, actually transported by way of the line of the party of the third part and the Southern Pacific line, shall be reported to such common fund than the amount that shall be necessary (when added to the amount reported for other through traffic transported by the party of the third part) to make the sum equal to the proportion of the common fund to which the third party is entitled. Said common fund shall, when settlements are made between the parties in manner and form 'as provided in said original articles, be divided into four equal parts, one of which shall be paid to each of the parties hereto. This result shall be accomplished, so far as shall be practicable, by a physical division of the traffic to be accounted for (aided by diversion from one line to another) into four equal parts, one of which shall be transported by each of the parties hereto. When, for any reason, such division of the traffic has not been made during the month, the party or parties who shall receive an excess over the share to which it shall be entitled, as above provided, shall pay to the party or parties who shall not have received their full shares a sum or sums of money sufficient to make the division exact in producing gross revenue to the parties."

The pooling and division of traffic intended by the contracts were to be accomplished, so far as might be, by physical division of the traffic itself, between the companies, in certain fixed proportions; and, where this was not or could not be done, it was to be accomplished by pooling and division of the gross earnings of such traffic between the companies in such fixed proportions. The contract was to continue for 25 years.

In May, 1884, Solon Humphreys and Thomas E. Tutt were appointed receivers of the property, rights, and franchises of the Wabash, St. Louis & Pacific Railway Company by the circuit court of the United States for the eastern district of Missouri; and, as such receivers, they operated the railway committed to their charge until, under the decree and order of the court, the property was sold and transferred to the purchasers. The receivers acquiesced in the contracts referred to until March 31, 1887, when, by consent of all the parties, they were abandoned.

In the course of business, under the contracts, the traffic involved was not actually divided between and carried by the companies in the proportions fixed; but the Wabash, St. Louis & Pacific Railway Company, among others, actually carried more than the share allotted to it, and the Chicago, Milwaukee & St. Paul Railway, among others, actually carried less. The pool commissioner, provided for by the contracts, ascertained and made a statement of the differences, and, in making an adjustment of them, directed that the Wabash receivers should pay to the Chicago, Milwaukee & St. Paul Railway Company a sum which, after deducting admitted credits, amounted to $18,-404.40; and this suit was instituted to recover that amount.

The defense is that the contract upon which the claim is based is against public policy, and void. The court below (Thayer, J.) sustained this defense, and the intervener appealed. There was no evidence of the rate fixed by the parties for the traffic involved in their contract, and no evidence as to their mode of operating under the contract beyond what is afforded by the contract itself.

John W. Cary, for appellant.
F. W. Lehmann, for appellee.

. , Before CALDWELL and SANBORN, Circuit Judges.

CALDWELL, Circuit Judge (after stating the facts). The design of the contract on which the appellant rests its claim is not left to presumption or conjecture. Its purpose is apparent on the face of the instrument. Its object was not to avoid ruinous com-

petition by entering into an arrangement to carry freight at reasonable rates, but its evident purpose was to stifle all competition for the purpose of raising rates. By the terms of the contract, all of the roads are to be operated, as to through traffic, "as they should be if operated by one corporation which owned all of them." These seven corporations were made one company so far as concerned their relations with each other, with rival carriers, and with the public. Between them there could be no competition or freedom of action. To the extent of the traffic covered by this contract,—and it covered no inconsiderable portion of the traffic of the continent,—each company practically abdicated its functions as a common carrier, and conferred them on a new creation, for the sole purpose of suppressing competition. Before they entered into this contract, each of these companies had the power, and it was its duty, to make rates for itself, and to make them reasonable; but, by the terms of this contract, every one of the companies was divested of all its powers and discretion in this respect. The contract removed every incentive to the companies to afford the public proper facilities, and to carry at reasonable rates; for, under its provisions, a company is entitled to its full percentage of gross earnings, even though it does not carry a pound of freight. The necessary and inevitable result of such a contract is to foster and create poorer service and higher rates. There is no inducement for a road to furnish good service, and carry at reasonable rates, when it receives as much or more for poor service, or for no service, as it would receive for good service and an energetic struggle for business.

A railroad company is a quasi public corporation, and owes certain duties to the public, among which are the duties to afford reasonable facilities for the transportation of persons and property, and to charge only reasonable rates for such service. Any contract by which it disables itself from performing these duties, or which makes it to its interest not to perform them, or removes all incentive to their performance, is contrary to public policy and void; and, the obvious purpose of this contract being to suppress or limit competition between the contracting companies in respect to the traffic covered by the contract, and to establish rates without regard to the question of their reasonableness, it is contrary to public policy, and void. Railroad Co. v. Closser, 126 Ind. 348, 26 N. E. 159; Gulf, C. & S. F. R. Co. v. State (Tex. Sup.) 10 S. W. 81; State v. Standard Oil Co. (Ohio Sup.) 30 N. E. 279; Texas & P. Ry. Co. v. Southern Pac. Ry. Co. (La.) 6 South. 888; Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. 553; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Salt Co. v. Guthrie, 35 Ohio St. 666; Stanton v. Allen, 5 Denio, 434; Hooker v. Vandewater, 4 Denio, 349; Chicago Gaslight & Coke Co. v. People's Gaslight & Coke Co., 121 Ill. 530, 13 N. E. 169; West Virginia Transp. Co. v. Ohio River Pipe Line Co., 22 W. Va. 600; W. U. Tel. Co. v. American Union Tel. Co., 65 Ga. 160; Sayre v. Association, 1 Duv. 143; U. S. v. Trans-Missouri Freight Ass'n, 7 C. C. A. 15, 58 Fed. 58.

But, conceding that the contract is illegal, and void, the appellant asserts that it has been performed, and that the appellee is bound to account for moneys received under the contract according to its terms. This contention rests on a misconception of the character of this suit. The appellant's claim is grounded on the illegal and void contract, and this suit is, in legal effect, nothing more than a bill to enforce specific performance of that contract.

The contract contemplated two modes of pooling,—one by an actual division of the traffic, and the other by a division of the gross earnings. The traffic not having been divided, this is a suit to enforce the second method of the pool,—a division of the gross earnings; or, in other words, a pooling of the earnings. The illegal and void contract has not been executed, and the appellant invokes the aid of the court to compel the Wabash Company to execute it on its part by pooling its earnings. It may be conceded that the illegal contract has been performed on the part of the appellant, though it does not appear to have done anything more than to sign the contract. The only thing it could do towards a performance of the contract was not to compete for the business. This was a violation of its duty to the public, and illegal. But a contract performed on one side only is not an executed contract. Where an illegal act is to be done and paid for, the contract is not executed until the act is done and paid for. A court will not compel the act to be done, even though it has been paid for. Neither will it compel payment, although the act has been done; for this would be to enforce the illegal contract. The illegality taints the entire contract, and neither of the parties to it can successfully make it the foundation of an action in a court of justice. The Wabash Company performed the service that earned the money the appellant is seeking to recover. The appellant earned no part of it. There is nothing in the record to show that the appellant would have carried more or the Wabash Company less freight if the contract had never been entered into. The money demanded was received by the Wabash Company for freight tendered to it by shippers themselves, and carried by it over its own line. It was legally bound to accept the freight thus tendered, and was entitled to receive the compensation for the carriage, and cannot be compelled to pay the money thus earned, or any part of it, to the appellant on this illegal and void contract.

The case of Brooks v. Martin, 2 Wall. 70, is not in point. In that case the defendant set up an illegal contract, which had been fully performed and executed, as a defense against a demand that existed independently of the contract; whereas, in this case, the illegal contract is set up by the plaintiff as the foundation of its action. Strike this contract out, and confessedly the complaint states no cause of action; leave it in, and it states an illegal and void cause of action.

Courts will not lend their aid to enforce the performance of a contract which is contrary to public policy or the law of the land, but

will leave the parties in the plight their own illegal action has placed them. Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 11 Sup. Ct. 478; Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. 553; Texas & P. Ry. Co. v. Southern Pac. Ry. Co., 41 La. Ann. 970, 6 South. 888; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Hooker v. Vandewater, 4 Denio, 349. We have not overlooked the case of Central Trust Co. v. Ohio Cent. R. Co., 23 Fed. 306. The opinion in that case is not supported by the authorities, and is unsound in principle.

The decree of the court below is affirmed.