REINHARDT, Circuit Judge,
dissenting in part and concurring in part,
joined by Judges SCHROEDER and GRABER:
Our antitrust law reflects Congress’s judgment that, with rare and specific exceptions, free competition for customers among firms protects and benefits the public by increasing efficiency and output, lowering prices, and improving the quality of the products and services available.[1] No court has ever upheld an agreement among multiple employers to set prices or share profits.
In this case, the four largest supermarket chains in Southern California, controlling 60-70% of the market, entered into a profit sharing agreement according to a predetermined formula for the indeterminate period of an anticipated labor dispute and for a short period afterwards. The supermarkets contend that it is lawful for them to do so because, although profit sharing agreements are by their nature anticompetitive and thus constitute a restraint of trade, their particular profit sharing agreement differs in two respects from profit sharing agreements that have been held to violate the antitrust laws: first, the agreement was to last for only the limited duration of the strike, however long that might be; and, second, the four supermarkets control only a substantial majority but not 100% of the market.
The majority agrees with the supermarkets that these two factors make their profit sharing agreement sufficiently different from those in all the previously decided cases that, in order to determine whether their agreement has an anticompetitive effect, it is necessary to apply not just the fact-sensitive intermediate test *1145 that the Supreme Court has endorsed for assessing less complex restraints of trade, but the most rigorous and exhaustive “rule of reason” analysis that requires a full-scale duel of economic experts over complicated and sophisticated market issues. I disagree.
The profit sharing agreement’s indeterminate duration and less-than-total domination of the market are immaterial to an analysis of an agreement that inherently violates the antitrust laws. The correct method of analysis of a profit sharing agreement is either the simple per se rule or another intermediate standard such as quick look, by which we examine the anti-competitive effects of an agreement according to its particular circumstances, details, and logic, in light of the generally applicable antitrust law, fundamental principles of economics, and clear experience of the market. See Cal. Dental Ass’n v. FTC, 526 U.S. 756, 780-81, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). Because a battle royale of economic experts in the courts is unnecessary and because defendants’ profit sharing agreement can readily be determined to violate the antitrust laws under the intermediate standard, I would reverse the district court’s denial of summary judgment to plaintiff and hold that the profit sharing agreement violates section 1 of the Sherman Act. Accordingly, I dissent in part.[2]
I.
Section 1 of the Sherman Act bans agreements or combinations that act as unreasonable restraints on interstate commerce. See State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Defendants entered into an agreement to share profits. Such agreements have traditionally been held to be anticompetitive because they remove the incentive to engage in competitive behavior. Defendants have two principal contentions as to why their profit sharing agreement is different: first, that their profit sharing is for a limited, if indefinite period; and, second, that their agreement does not include 100% of the participants in the market. They also contend, by way of response to plaintiffs prima facie case, that their profit sharing agreement helps them to prevail in the labor dispute and thereby to achieve their goal of lowering wages and benefits paid to their employees. Doing so, defendants allege, aids competition in the Southern California market.
It is evident from a rudimentary knowledge of economics, as well as from a reading of the case law, that neither the agreement’s limited duration nor its failure to include the fragmented group of other firms operating in the market could do more than reduce the ordinary anticompetitive effects of such agreements. Certainly these factors would not eliminate such effects. An analysis of the details, logic, and circumstances of the particular profit sharing agreement, including its relationship to the anticipated strike, confirms that conclusion. The agreement’s effect is necessarily anticompetitive and, like any other profit sharing agreement of limited duration among firms that control well over a majority, but less than 100% of the market, the anticompetitive effects might be reduced to some extent but they certainly would not be eliminated.
A.
The “presumptive or default,” Maj. Op. at 1133, method of analysis for determin *1146 ing whether an agreement is an unreasonable restraint on trade such as violates section 1 of the Sherman Act is rule of reason review. In conducting that review, courts fully examine factors such aS “specific information about the relevant business,” “the restraint’s history, nature, and effect,” and “[wjhether the businesses involved have market power,” with the purpose of “distinguishing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer’s best interest.” Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (internal quotation marks omitted).
Rule of reason review is data-intensive and, consequently, expensive for litigants; also, it consumes large amounts of court time and other resources. See Arizona v. Maricopa Cnty. Med. Soc’y, 457 U.S. 332, 343-4 & n. 14, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). For these reasons, as well as to provide guidance to the business community, see Cont’l T.V., Inc., v. GTE Sylvania Inc., 433 U.S. 36, 50 n. 16, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), courts have developed summary methods of identifying section 1 violations in circumstances in which such violations are discernible without a full rule of reason analysis: namely, per se review and quick look review. Per se analysis examines whether prior judicial experience with the type of restraint at issue is sufficient to allow a determination that it would always or almost always tend to restrict competition and decrease output. See Leegin, 551 U.S. at 886,127 S.Ct. 2705. The focus of the inquiry is on accumulated data from prior decisions: an agreement may be declared unlawful with no further analysis, simply by virtue of its being of a type that courts have previously determined to have “manifestly anticompetitive effects,” but no “redeeming virtue.” Id. (internal quotation marks omitted).
In contrast, an arrangement violates section 1 under a quick look approach when “an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.” Cal. Dental Ass’n v. FTC, 526 U.S. at 770, 119 S.Ct. 1604. Quick look review is not necessarily based on a history of rule of reason adjudications; rather, it asks whether a “great likelihood of anticompetitive effects can easily be ascertained” by examining the restraint and considering the defendants’ justifications for it. See id.; see also XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1911a, at 296-97 (2d. ed. 2004 Supp.) (Quick look review “is usually best reserved for circumstances where the restraint is sufficiently threatening to place it presumptively in the per se class, but lack of judicial experience requires at least some consideration of proffered defenses or justifications.” (footnote omitted)).[3]
*1147 California contends that defendants’ profit sharing arrangement violates section 1 under either the per se rule or quick look review. Its assertion that the agreement strongly resembles arrangements that pri- or cases have found violative of section 1 is correct, although the particular circumstances of the restraint in question do differ from the circumstances relating to the profit sharing arrangements examined in those earlier cases. It is unnecessary, however, to determine whether such differences are sufficiently material that we should refrain from concluding that defendants’ profit sharing agreement was illegal under a strict.per se analysis, because the agreement was plainly illegal under a quick look or, more accurately, a combined or mixed form of intermediate review. “[A] great likelihood” that defendants’ profit sharing arrangement produced “anticompetitive effects” is manifest, Cal. Dental Ass’n, 526 U.S. at 770, 119 S.Ct. 1604, and defendants offer no plausible procompetitive benefits that would overcome or neutralize those effects so as to require full rule of reason analysis.
Although the parties briefed the case on the traditional view that the two summary forms of review are separate and unrelated, and the questions they posed are here discussed separately to some extent, the lawfulness of the agreement is best analyzed in light of the Supreme Court’s recent explanation that “our categories of analysis of anticompetitive effect are less fixed than terms like ‘per se,’ ‘quick look,’ and ‘rule of reason’ tend to make them appear.” Id. at 779, 119 S.Ct. 1604. According to Justice Souter, writing for the Court, “[w]hat is required ... is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint,” with the object of determining “whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion” can be drawn that the “principal tendency” of an agreement is anti-competitive. Id. at 780, 119 S.Ct. 1604. I would follow the Court’s suggestion and would apply a mixed or blended approach, engaging in an analysis “meet for the case” — here, an analysis that compels the confident conclusion that the principal tendency of defendants’ agreement is anticompetitive and that the agreement thus violates section 1 of the Sherman Act. On the basis of that intermediate analysis, I would reverse the district court and hold that defendants’ profit sharing arrangement is unlawful.
B.
I first discuss the applicability of strict per se analysis. “The rationale of the rule of per se illegality depends on the premise[ ] that ... judicial experience with a particular class of restraints shows that virtually all restraints in that class operate so as to reduce output or increase price.” XI Areeda & Hovenkamp ¶ 1911a, at 295. Accordingly, application of the per se rule is limited to restraints of a type that courts’ “considerable experience” has revealed to have “manifestly anti-competitive effects,” and no “redeeming virtue,” such that judges can “predict with confidence that it would be invalidated in all or almost all instances under the rule of reason.” Leegin, 551 U.S. at 886-87, 127 S.Ct. 2705. Thus, the question for per se analysis is whether defendants’ agreement is of a type that courts have previously determined to have such perni *1148 cious effects. California argues that defendants’ profit sharing arrangement was both a profit pooling agreement and a market allocation agreement, each of which courts have determined to be subject to per se invalidation. As I explain below, the contention that defendants’ agreement was a market allocation agreement is without merit. The question whether it was a profit sharing agreement sufficiently similar to the profit sharing agreements that courts have previously examined and invalidated is much closer. Below, I discuss the relationship between defendants’ profit sharing agreement and profit sharing agreements invalidated in prior cases but, ultimately, do not determine whether defendants’ agreement constituted a per se violation of the Sherman Act. Rather, as I explain below, in determining that it was unlawful, I would apply a per se-plus or a quick look-minus analysis, a combined or mixed approach, somewhere between pure per se and pure quick look, along the meet-for-the-case lines suggested by the Court in California Dental Association.
1.
California contends that defendants’ profit sharing agreement is essentially identical to those profit pooling and sharing schemes that the Supreme Court has found to be per se violations of section 1. See Citizen Publ’g Co. v. United States, 394 U.S. 131, 135, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) (“Pooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act.”); see also United States v. Paramount Pictures Inc., 334 U.S. 131, 149, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (profit sharing agreement a “bald effort[ ] to substitute monopoly for competition”); N. Sec. Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904); Chicago, M & St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co., 61 F. 993 (8th Cir.1894); Anderson v. Jett, 89 Ky. 375, 12 S.W. 670 (1889).
Profit pooling or profit sharing arrangements eliminate incentives to compete for customers along every dimension: there is little purpose in attempting to attract another firm’s customers by lowering prices, improving quality, or taking any other measure if the profits earned from those new customers would be placed in a common pool in which the other firm is a participant, and the proceeds distributed in the same way no matter which participant in the profit pool generated the underlying sales, or if transfer payments are made between firms to achieve the same effect. See N. Sec. Co., 193 U.S. at 328, 24 S.Ct. 436 (pooling profits “destroy[s] every motive for competition between ... natural competitors.”); Chicago, M. & St. P. Ry. Co., 61 F. at 997 (a profit sharing agreement by which railroads that carried less than a predetermined share of freight were compensated by other railroads such that their share of total revenues remained constant had “[t]he necessary and inevitable result of ... foster[ing] and creating] poorer service and higher rates”). The Sherman Act was intended to curb just such restraints on competition.
Defendants contend that there are three ways in which their scheme differs from the profit pooling or sharing that was held unlawful in prior cases. The first of these contentions is meritless. Defendants argue that, unlike the agreements in prior cases, which provided that the parties would share all profits, their agreement provides that any party that experiences an increase in relative market share would share with the others only 15% of its increase in relative revenue, and that the sums to be redistributed are less than all of the profits earned on those increased *1149 revenues. There is no question, however, that the 15% figure was defendants’ estimate of the total additional profits to be earned as a result of any increase in relative market share while the profit sharing agreement was in effect. This plan to share all the additional profits earned is what is relevant. Richard Cox, a vice president of Safeway who helped to draft the agreement, stated in his deposition that the 15% was meant to represent accurately the profit that a chain would collect on increased revenues that were earned without an increase in fixed costs. Defendants do not dispute the accuracy of his testimony. Their proffer is the statement of their expert witness, who conjectured that it was “plausible” and “likely” that incremental profits were greater than 15% of revenues, but admitted that he had done no analysis of incremental profitability from the data.[4] Defendants cannot force the expense of full rule-of-reason litigation on courts and opposing parties simply by speculating that they may have gotten their arithmetic wrong when they were setting up their scheme to share profits; their plan to share profits is sufficient, whether or not the scheme as implemented achieved that objective to perfection.
Defendants’ other two contentions, however, raise sufficient question as to whether their profit sharing scheme should be invalidated under a strict per se approach or whether additional analysis of the agreement and its likely effects would be beneficial, and whether the court should proceed to a quick look approach or, more accurately, to a mixture or combination of the two approaches.
First, while profit sharing agreements in previous cases were to last for decades or permanently, defendants’ scheme is scheduled to last only for the period of the labor dispute, plus two additional weeks. See Citizen Publ’g, 394 U.S. at 133, 89 S.Ct. 927 (fifty-year agreement); Paramount Pictures, 334 U.S. at 131, 68 S.Ct. 915 (considering apparently permanent profit sharing agreements); N. Sec. Co., 193 U.S. at 197, 24 S.Ct. 436 (finding illegal an apparently permanent profit pooling arrangement); Chicago, M. & St. P. Ry. Co., 61 F. at 996 (“The contract was to continue for 25 years.”). That the term of the scheme could expire in a relatively short period — anywhere from a few weeks to a year or more, depending on the length of the strike — is no defense if the scheme is anticompetitive. Section 1 of the Sherman Act proscribes all anticompetitive agreements, regardless of their duration: neither the text of the statute nor the case law contains an exception for anticompetitive agreements that last for less than a fixed period of substantial length. However, defendants’ contention is that no anti-competitive effects could result from their arrangement, because the potentially short term of the profit sharing leaves them with sufficient incentive to compete for customers, whose allegiance might be retained after the end of the strike. Because courts have not previously considered profit sharing arrangements of a potentially very short duration, the court probably should not simply apply a pure per se analysis to defendants’ arrangement.
Second, unlike firms in most of the prior profit sharing cases, which were the only firms of their kind operating in the relevant market, defendants were not the only *1150 supermarkets in the affected areas. See, e.g., Citizen Publ’g, 394 U.S. at 133, 89 S.Ct. 927 (the defendants were the only-general distribution newspapers in Tucson). California is correct that a profit sharing plan need not cover the entire market in order to affect competition. However, it is incorrect that the distinction between a profit sharing plan that covers the entire market and one that does not is unworthy of any consideration before we make a determination whether anticompetitive effects will result from an agreement. As with the previous distinction, courts have not explored the question sufficiently to allow certitude with the application of a strict per se approach here.
2.
California next contends that the profit sharing agreement was a market allocation agreement that allocated the Southern California grocery market according to defendants’ historic shares of that market. Market allocation agreements are “classic per se antitrust violation[s].” See United States v. Brown, 936 F.2d 1042, 1045 (9th Cir.1991). Courts have treated as unlawful market allocation agreements assigning particular territories to particular vendors, see Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49-50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam); United States v. Topeo Assocs., Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), assigning certain customers to certain vendors, see White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), and capping total sales volume of the market and assigning participants fixed shares of that total volume, see United States v. Andreas, 216 F.3d 645, 666-68 (7th Cir. 2000). The common thread to these decisions is that in allocating the market, firms ensure that customers attempting to purchase products in the relevant market will have fewer firms competing for their business.
In contrast to the agreements at issue in the market allocation cases, however, defendants’ agreement is not alleged to have decreased the number of supermarkets available to customers. Rather, California alleged that the agreement simply reduced the competition for customers among the defendant businesses. Thus, it does not allege a market allocation claim appropriate for either strict per se analysis or a mixed or blended approach, and we need proceed no further with that question. In view of the above, I would decline to hold that California prevails on a strict per se theory.
C.
Turning from a strict per se to a quick look, or rather, in this case, to a combined or mixed approach, fair analysis requires careful inquiry. An agreement violates section 1 of the Sherman Act under a quick look analysis when “an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.” Cal. Dental Ass’n, 526 U.S. at 770, 119 S.Ct. 1604. If so, the burden of proof shifts to the defendant “to show empirical evidence of procompetitive effects,” See id. at 775 n. 12, 119 S.Ct. 1604; XI Areeda & Hovenkamp ¶ 1914d(l) at 355. Accordingly, a court seeking to determine on a “quick look” whether an arrangement violates section 1 must first determine whether it can “easily ... ascertain! ]” a “great likelihood of anticompetitive effects,” Cal. Dental Ass’n, 526 U.S. at 770, 119 S.Ct. 1604, and, if so, whether any such effects are neutralized or outweighed by proeompetitive benefits.
Taking into account the Supreme Court’s recent explanation that the “cate *1151 gories of analysis of anticompetitive effect are less fixed than terms like ‘per se,’ ‘quick look,’ and ‘rule of reason’ tend to make them appear,” and that rather than drawing “categorical line[s]” between restraints, a court reviewing an agreement that is alleged to violate section 1 must conduct “an enquiry meet for the case,” see id. at 779-81,119 S.Ct. 1604, a court in a case like that before us should look to the history of judicial experience with profit sharing agreements, apply rudimentary economic principles to the meaning and effects of the particular agreement in question, and carefully analyze the circumstances, details, and logic of the agreement in order to determine the likelihood of anticompetitive effects. Then it must consider the purported procompetitive effects that the defendants suggest are sufficient to overcome any anticompetitive effects of the agreement. The question, then, under the combined or mixed approach is whether, after conducting the requisite review and analysis the court can reach a “confident conclusion [that] the principal tendency” of the agreement is to restrict competition. See id. at 781,119 S.Ct. 1604.
Significantly, a “confident conclusion” does not always prove ultimately correct. See supra note 3. Rather, it represents a tool of judicial economy designed to save the litigants and the courts a considerable investment of time and money, which in the balance is to the benefit of all. That occasionally we might be wrong is a price that it is long established that society is willing to pay. In fact, some of the conclusions of which our leading economic experts have been confident have turned out to be incorrect. For example, Alan Greenspan, appointed and then reappointed Chairman of the Federal Reserve for five terms by four different Presidents, recently admitted to a significant flaw in the ideology that caused him to support and implement policies of financial deregulation: “We made a mistake in presuming that the self-interest of organizations, specifically banks and others, were such that they were best capable of protecting their own shareholders.” See Paul M. Barrett, While Regulators Slept, N.Y. Times, Aug. 6, 2009, at BR 10. And Judge Richard Posner, a highly respected jurist and a leading economics expert, has recently expressed his admiration for Keynesian economics, reversing a lifetime of reliance on the Chicago School’s approach. See John Cassidy, Letter from Chicago, The New Yorker, Jan. 11, 2010, at 28. Thus, a “confident conclusion” for purposes of quick look and other limited approaches means, at most, a reasonably confident conclusion a court may reach that, on some occasions, may prove to be incorrect. Equally incorrect, however, may be a conclusion reached by a body of economics experts after years of study or even a verdict reached by a jury following a full-scale trial with the most careful and thorough development of a full evidentiary record with the aid of the most experienced antitrust lawyers and expert witnesses.
Here, I am confident in my conclusion that defendants’ profit sharing agreement creates a “great likelihood of anti-competitive effects,” and that such effects are not outweighed or neutralized by any plausible procompetitive benefits. I am confident that neither the duration of the agreement nor the fact that defendants have less than a 100% share of the market significantly affects the anticompetitive “principal tendency” of the profit sharing agreement. In reaching this conclusion, I have considered whether, because the objective of the agreement was to affect the outcome of a labor dispute and to bring about a reduction in labor costs, my conclusion should be altered. My answer is a definite and unqualified “No.” Finally, although the parties introduced some evidence to support *1152 their respective positions, I do not rely on such empirical proof in reaching this conclusion; I note, however, that to the extent that it is relevant, the evidence appears either to support the conclusion that I would reach or, alternatively, to add little or nothing of any significance to my analysis. Finally, although some confident conclusions may ultimately prove to be incorrect, I am confident that this one will not.
1.
a.
Defendants entered into an agreement under which they shared profits with one another according to their historic shares of the market. As discussed above, the only factors distinguishing defendants’ arrangement from a profit sharing agreement that would have constituted a per se violation of section 1 of the Sherman Act are (1) the presence in Southern California of a fragmented cluster of smaller markets with a residual minority of the market share, and (2) the indefinite, if limited, term of the agreement. Absent those features, defendants’ scheme would simply constitute a profit pooling or sharing arrangement akin to the ones held violative of section 1 in earlier cases, and there would be no question that the agreement creates a “great likelihood of anticompetitive effects.” This is apparent from the fact that when firms sharing profits are the only firms in a market, each' will receive the same portion of the total profits whether it cuts prices, invests in improving its products or services, or does nothing to win customers from the other firms; the result of this lack of competitive pressure is the high likelihood that prices rise towards monopoly levels or fail to fall with the same effect. It is for these reasons that the Supreme Court has said that “[p]ooling of profits pursuant to an inflexible ratio” is a “§ 1 violation!]” that is “plain beyond peradventure.” Citizen Publ’g, 394 U.S. at 135-36, 89 S.Ct. 927.[5]
The well-recognized effects of profit sharing set forth above help to guide the discussion in the case before us: that discussion starts from the premise that the sharing of profits among competitors ordi *1153 narily has substantial adverse effects on competition. Next is the consideration whether either of the aspects of the agreement before us that defendants assert materially distinguish it from ordinary profit sharing arrangements would, in light of the “circumstances, logic, and details of the restraint,” preclude that agreement from having the anticompetitive effect that would otherwise occur.
In an ordinary period in which no profit sharing arrangement is in effect, defendants compete with one another, and with a smaller set of other unrelated grocers, for customers and sales. The fruits of successful competition might accrue both in the present, as a supermarket makes sales in the current period, and in the future, as customers won or retained through such competition return to the store to make more purchases. Defendants contend that a profit sharing agreement of limited duration, restricted to the dominant market participants, does nothing to alter the ordinary incentive structure, and that the competitive pressure while such a profit sharing agreement is in effect is no less than the competitive pressure that would occur in the absence of such an agreement. Having reviewed their contentions and analyzed all the plausible effects of the agreement, I disagree. I am confident in the conclusion that defendants’ profit sharing arrangement removes, or at the least significantly reduces, a key source of competitive pressure — competition among defendants for sales to be made during the agreement period — without there being any countervailing pressure sufficient to neutralize or overcome the overwhelming likelihood of anticompetitive effects. Although it is plausible that the two differences on which defendants rely will serve to reduce the competitive pressures to a lesser extent than would a long-term agreement among competitors who control 100% of the market, it is evident that the lessening of the reduction in competitive pressure will be one of degree only, and that there is no likelihood whatsoever that the anticompetitive effects of a profit sharing agreement will be eliminated.
As already stated, when an arrangement redistributes all profits on current sales among a group of competitors according to a predetermined ratio, as defendants’ arrangement does, there is little reason for the individual firms within the group to compete with one another for those sales. Thus, the analysis begins with the determination that there is a high likelihood that defendants’ agreement has a substantial negative effect on their incentive to compete with one another for customers in order to make sales during the period in which the agreement is in effect. Defendants nonetheless contend that there is an incentive to compete with one another for customers during the profit sharing period, pointing to the indefinite duration of the agreement and to the possibility that customers who are won or retained through competition during that period will remain as customers after the agreement ends. Additionally, they contend that the other firms in the market will exert competitive pressure on them sufficient to make up for any loss of competitive pressure among themselves. These contentions must be examined for their validity during the period of limited duration in general, and then in light of whether the particular circumstance of the agreement — an impending labor strike— alters that general analysis.
First, for a profit sharing agreement of limited but indefinite duration, the incentive to compete for sales and profits that would occur at some future time would necessarily be less than the ordinary incentive to compete by seeking to attract customers who will patronize the stores *1154 starting immediately and will continue to patronize them in the future as well. The supermarkets assert that the profit sharing arrangement does not reduce their incentive to engage in competitive behavior because customers might buy goods at some indefinite point in the future in which profits would not be shared. Any such future incentives are at best speculative and must be heavily discounted. The sales that would produce those future profits might not be made for six months, or a year, or more. By paying money now for sales that would occur, if at all, only in the indefinite future, the defendants would incur the ordinary costs of obtaining customers without receiving the ordinary benefits that would accrue. Whatever incentive might remain, with the agreement in place, for the supermarkets to compete for customer purchases in the future is considerably outweighed by the incentives that the agreement reduces to compete for purchases today. Viewing matters most favorably to defendants, the anticompetitive effects resulting from an agreement of limited, if indefinite, duration might be diminished, but certainly would not be eliminated. There can be no question whatsoever that the profit sharing agreement of indefinite duration would at least to some degree reduce defendants’ incentive to compete.
With defendants exerting reduced competitive pressure on one another during the profit sharing period, competition from firms not included in the profit sharing agreement would have to result in an extraordinary amount of increased competitive pressure to make up for the loss of the paramount pressure that defendants ordinarily exert on each other. This too is highly unlikely.[6] During the profit sharing period, defendants controlled at least 60% of the Los Angeles-Long Beach portion of the Southern California market and at least 70% of the San Diego portion, and between them operated more than 950 stores in the areas affected by the agreement, a combined presence sufficient to suggest an ability to significantly affect prices and other outcomes in the Southern California market.[7] Defendants would be *1155 at least partially insulated from competition from other vendors by virtue of the many and varied locations of their stores, which for numerous customers would be far more convenient to patronize than the markets operated by the other vendors. Defendants also would be partially insulated from such competition by the inability of the other vendors to compete effectively as a result of brand recognition (and, indeed, customer awareness of their existence), limited facilities, contracts with suppliers and staffing commensurate with their limited historical role in the market; factors that would substantially curtail the ability of the other vendors to serve additional customers.[8] Those other vendors would no more be able to increase their capacity, staff, supplies, and brand recognition overnight than they could immediately open new locations convenient for defendants’ customers. Nor would they be inclined to spend money to do so, knowing that the profit sharing agreement was of limited duration and, in fact, could end at any time. Finally, those other vendors are mainly independent of each other, consist of various types of markets, and would have neither the inclination nor the ability to agree on a uniform marketing policy that would significantly increase whatever competitive pressure the totality of those vendors ordinarily exerts on defendants. The overwhelming likelihood appears to be that, on the whole, smaller vendors would do little if anything to alter their marketing practices but rather would continue on their ordinary course, which would not serve to increase their economic pressure on defendants beyond what they ordinarily exert, or attract any large number of the customers that ordinarily patronize defendants.[9]
*1156 No one would dispute that the supermarkets’ agreement had anticompetitive effects if they had simply agreed to fix equal prices and wages in order to eliminate competitive risk. The agreement in this case generated no less irreducibly anti-competitive effects, because the supermarkets’ arrangement, like any other naked restraint on trade, reduced incentives to compete and yielded no plausible off-setting procompetitive or competition-neutralizing effects. A rudimentary knowledge of antitrust law dictates the conclusion that, if defendants in this case agreed to share profits for a limited period for their mutual economic benefit, there would be a violation of section 1 of the Sherman Act — at least in the absence of some extraordinary circumstance.
This brings us to defendants’ contention that the threat of a strike, or a strike itself, constitutes such a circumstance. First, then, we must consider whether the profit sharing agreement loses its anticompetitive effects when it becomes operative during the course of a strike or labor dispute. There should be little difficulty in answering that question: the fact that defendants’ agreement provides for profits to be shared only during a labor dispute and a brief ensuing period does not alter its inherently anticompetitive nature. Even during a strike period, a profit sharing agreement generates a “great likelihood of anticompetitive effects.” For a vendor, the principal features of an employee strike are diminished consumer demand, as some customers choose not to cross the picket lines; a reduced workforce, because some workers at least are on strike; and a more urgent financial condition, as fixed costs remain at nonstrike levels, and revenues go down. While diminished demand, a reduced workforce, and a more urgent financial condition might affect defendants’ competitive behavior during the strike, these potential effects would occur independent of the existence of a profit sharing agreement. None of these effects changes the basic impact of the agreement: defendants had little incentive to compete with one another while it was in effect because any profits earned on sales to another defendant’s former customers would simply be redistributed back to the other defendants.[10]
The profit sharing agreement itself would have an additional effect; it would cause defendants to compete even less during the strike period than they would were there no profit sharing agreement in effect at that time. Whatever the baseline circumstance as to competition in any given period, including a strike period, the existence of the profit sharing agreement results in a greater likelihood of reduced competition than there would otherwise be. That is the simple lesson that is apparent from a rudimentary knowledge of econom *1157 ics. Profit sharing necessarily serves to diminish the incentives to compete below whatever the level of competition would be in the absence of such an agreement; it is inherently, or as some courts have said, intuitively, anticompetitive and has the same, or a similar, effect on competition during a strike as it would have before the strike and after it ends. See Cal. Dental Ass’n, 526 U.S. at 780-81, 119 S.Ct. 1604. The ultimate impact that the agreement has on pricing or output might be lower or higher depending on other circumstances, such as the existence of the anticipated labor dispute; however, whether greater or lesser, the net effect in all circumstances would be anticompetitive.
For the reasons explained above, I conclude that a “great likelihood of anticompetitive effects can easily be ascertained” by examining the agreement in light of prior eases, in light of its circumstances and details, as well as in light of logic and rudimentary principles of economics. Here, those anticompetitive effects are not only substantial, but they result from an agreement that removes fundamental incentives to engage in competition for an indefinite period. In short, neither the fact that there are a number of smaller companies in the market, the fact that the agreement is of an indefinite though limited duration, nor the fact that the agreement takes effect during a strike, warrants a departure from the well-established rule that profit sharing agreements are anti-competitive and violate section 1 of the Sherman Act.
b.
Defendants’ fallback position is that the state lacks empirical evidence to demonstrate that the effects of the agreement were anticompetitive in practice. However, neither per se nor quick look review ordinarily requires empirical evidence of anticompetitive effects, nor is it required for the combined or mixed per se/quick look approach that should be applied here. As Professors Areeda and Hovenkamp explain, “[t]he main difference between ... the ‘quick look’ approach and the rule of reason is that under the former the plaintiffs case does not ordinarily include proof of [market] power or anticompetitive effects.” XI Areeda & Hovenkamp ¶ 1914d(l), at 355; see also Cal. Dental Ass’n, 526 U.S. at 779-80, 119 S.Ct. 1604 (explaining that the “quality of proof required should vary with the circumstances;” that “naked restraints] on price and output need not be supported by a detailed market analysis in order to” move to the second step of the quick look analysis and “require” defendants to produce “some competitive justification”; and that not “every case attacking a less obviously anticompetitive restraint ... is a candidate for plenary market examination”) (internal quotation marks omitted). So long as the anticompetitive nature of the likely effects of an agreement is, as a theoretical matter, “obvious,” it is not necessary for a plaintiff to provide empirical evidence demonstrating anticompetitive consequences. See Cal. Dental Ass’n, 526 U.S. at 770-71, 119 S.Ct. 1604; see also NCAA v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 109-10, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Such a rule is necessary in antitrust cases, where “reliable proof’ of such effects might be “impossible to produce.” XI Areeda & Hovenkamp ¶ 1901d at 207 (also noting that “in most [antitrust] cases ... the impact on output,” which in this case would be diminished sales at higher prices, “is assessed by inference from the nature of the agreement and surrounding circumstances rather than by actual empirical measurement”).
This is a case in which reliable proof of anticompetitive effects or their absence through empirical evidence might be diffi *1158 cult to obtain. Defendants’ own expert explained that, because the profit sharing agreement took effect only during the labor dispute and both the agreement and the labor dispute might affect defendants’ pricing decisions, the data required to best distinguish between the effects of the strike and those of the agreement and determine whether and how the agreement affected competition between defendants do not exist. See Declaration of Thomas R. McCarthy ¶ 47.
This is, more important, a case in which the anticompetitive nature of the restraint is obvious. As discussed above, by the terms of the agreement any defendant that earns profits above its historic market share is required to give those additional profits to the other defendants. Because a defendant may not retain any profits that it made from competing with the other defendants and receives a proportionate share of whatever profits those other defendants make from competing with it, the profit sharing agreement plainly reduces the competitive pressure among defendants for sales whenever it is in effect, during the strike or otherwise. To justify their conduct, defendants rely not on the neutral or positive effect on competition arising out of their agreement, but on other sources of competitive pressure — increased competition from other vendors and competition with one another for post-strike business. As explained above, it is wholly implausible that those factors would be sufficient to overcome the reduction in competitive pressure that necessarily results from the profit sharing agreement. Defendants’ agreement plainly removes a significant source of competitive pressure without giving rise to any comparable counter-source to replace it.[11] Accordingly, California has carried its burden by *1159 demonstrating the existence of a great likelihood of anticompetitive effects.
Although California was not required to adduce empirical evidence of anticompetitive effects, given the nature of the restraint at issue in the case, the empirical evidence before us supports its contentions or is, at the least, of no substantial consequence. Defendants acknowledge diminished competitive behavior, such as discounting and advertising, during the period in which the profit sharing agreement was in effect. This, in all likelihood, resulted in at least some increase in, or some failure to reduce, the prices charged to the consumers. See Declaration of Thomas R. McCarthy, Backup to ex. 7A; Declaration of Steven Lawler at ¶ 8; Declaration of Carla Simpson ¶¶ 6-7; Declaration of Charles Ackerman ¶¶ 15-19. Defendants explain this change in behavior by attributing it to the lack of personnel created by the strike, rather than to the profit sharing agreement. However, their expert, who relied on this explanation, performed no regression or other statistical analyses, which are typical means of determining the effects of multiple variables, such as the labor dispute and the profit sharing agreement, on a single dependent variable, such as competitive behavior by defendants. See, e.g., Hemmings v. Tidyman’s Inc., 285 F.Sd 1174, 1183-84 & n. 9 (9th Cir.2002). Instead, he simply looked at limited data from Albert-sons and declared that Albertsons “did a lot of discounting during the strike” and that it increased its use of certain discounting methods. See Declaration of Thomas R. McCarthy ¶¶ 51-53. Because his analysis lacks a discussion of how much discounting Albertsons would have done absent the profit sharing agreement, it is beside the point. California’s expert, who did perform regressions, asserted in his deposition that those regressions revealed that competition between defendants during the strike was harmed by the profit sharing agreement. He further noted that Vons raised its prices despite suffering a dramatic drop in demand for its products, exactly the opposite of the lower prices that are expected when demand drops in a competitive marketplace.[12]
*1160 Given the obviously anticompetitive nature of defendants’ profit sharing agreement, no empirical data about the effects of the agreement are necessary for “an enquiry meet for [this] case.” Nonetheless, a review of the empirical evidence in the record only increases the certainty that defendants’ agreement generated a great likelihood of anticompetitive effects, that it is implausible that such effects could be overcome or neutralized by the conduct of defendants or others during the term of the agreement, and that requiring a full rule of reason inquiry would be contrary to the efficient and effective implementation of our antitrust laws.
2.
Where, as here, a “great likelihood of anticompetitive effects can easily be ascertained,” the burden of proof is shifted to the defendant to “to show empirical evidence of procompetitive effects.” Cal. Dental Ass’n, 526 U.S. at 770, 775 n. 12, 119 S.Ct. 1604; XI Areeda & Hovenkamp ¶ 1914d(l) at 355 (when “the restraint is of such a character that an anticompetitive effect may be presumed,” then “the only tolerance permitted to the defendant is to show” procompetitive effects). Procompetitive effects include efficiency gains, the development or improvement of products, and other benefits to consumers and society. See XI Areeda & Hovenkamp ¶ 1912c(2) at 320. In California Dental Association, for instance, the Supreme Court saw a plausible procompetitive justification for the dentist association’s restrictions limiting price and quality advertising in the potential of such restrictions to improve consumer information by eliminating false and misleading advertising. See 526 U.S. at 771-72,119 S.Ct. 1604.
At this point comes defendants’ actual and least justifiable contention. The supermarkets assert that conduct that serves to reduce the cost of labor serves a pro-competitive purpose, such as may excuse otherwise anticompetitive behavior. They contend that the procompetitive benefit of their agreement is that it increased their chances of winning the labor dispute and reducing the wages and benefits they would be required to pay to their employees, which in turn would increase their ability to lower prices and compete more effectively with other companies. See Declaration of Thomas R. McCarthy ¶ 10. Defendants’ proffered justification for their profit sharing arrangement is, in essence, a countervailing power defense that the restraint of trade is necessary in order to give them sufficient bargaining power to counteract the market power exercised by their striking workers and thereby to allow them to purchase their workers’ labor at a lower price.
As California points out, however, the chain of contingencies linking defendants’ exercise of bargaining power to reduced prices for consumer purchases renders any such procompetitive benefits of their profit sharing agreement purely speculative. Rule of reason examination of defendants’ countervailing power defense is accordingly unnecessary. “Suffice it to say that the theoretical literature suggests that countervailing cartels seldom improve the welfare of consumers.” XII Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 2015b at 158 (2d ed.2000).
*1161 More important, driving down compensation to workers in this way is not a benefit to consumers cognizable under our laws as a “procompetitive” benefit. Defendants do not pretend that they agreed to bargain in such a way that there will be a greater overall amount of labor purchased, for example because the transaction costs to purchase each unit of labor are lower when the supermarkets work together. Defendants’ argument for why their profit sharing agreement is procompetitive is instead, essentially, that it increases their bargaining power relative to striking workers in order to buy their labor at a lower price. In this way, the profit sharing arrangement resembles a cartel on the buyer side of the market.
The Supreme Court has made clear, however, that because antitrust law operates to correct all distortions of competition, it condemns market actors who distort competition, whether on the buyer side or seller side. See Weyerhaeuser Co. v. Ross-Simmons Hardwood, 549 U.S. 312, 322, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007) (“Predatory-pricing and predatory-bidding claims are analytically similar____ This similarity results from the close theoretical connection between monopoly and monopsony.”). Accordingly, the Court has long understood the Sherman Act to condemn buyer side cartels. See, e.g., American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); and certain exercises of single-firm buyer power. See Klor’s, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). A central problem with allowing a countervailing power defense to justify buyer collusion is that such defense would be raised “in almost any case where the selling market is not perfectly competitive,” such that all “[n]on-immune employers would claim the right to collude on wages because their employees are organized into unions and thus have significant power.” XII Hovencamp ¶ 2015b at 156.
In any event, defendants’ argument is wholly unpersuasive in light of our nation’s labor laws and policies. It is a primary objective of these laws to protect the rights and interests of working persons, and to enable them to obtain a fair and decent wage through collective action.[13] Reducing workers’ wages and benefits is hardly an objective that would justify a violation of our antitrust laws or constitute a benefit to the public so substantial as to overcome the deleterious consequences of anticompetitive conduct. There is no reason, even if we had the authority to do so, to set aside the ordinary principles governing antitrust law in order to unbalance the carefully developed legal structures relating to our laws governing collective *1162 bargaining; nor is there any reason or justification for assuming the function of increasing the economic power of employers to the disadvantage of their employees. To the extent that anticompetitive conduct is exempted from the application of our antitrust laws in order to facilitate the operation of labor/management processes, even the majority holds that it does not provide an escape device for the employers’ conduct in this case. Defendants have not offered, much less demonstrated, any way in which their agreement generates procompetitive effects.
It is little wonder that the majority expressly declines to address the “grocers[’J argu[ment] that the RSP has procompetitive benefits in the form of lower prices for consumers as a result of the grocers’ ability to negotiate a more favorable contract on labor costs.” Maj. Op. at 1138 n. 17. Were defendants’ proffered justification accepted as a ground for requiring full-blown rule of reason inquiry, colluding firms could evade quick look condemnation, without in any way increasing real efficiency or reducing costs to the consumer. Firms like the supermarkets that participate in markets for both buying (labor) and selling (groceries), and engage in a restraint of trade that has distorting effects in both, cannot avoid quick look review of anticompetitive conduct simply by positing that they could conceivably pass on to consumers in the selling market any private gains such firms may achieve by restraining competition in the buying market. Allowing them to do so would lead to the absurd result that conduct which restrains more competition, in the sense that it distorts competition in both the buying and selling markets, would be subject to less demanding scrutiny than would be a comparable restraint that distorted just one market.
3.
Defendants have .put forward no plausible procompetitive effects to overcome or neutralize the great likelihood of anticompetitive effects that would result from the implementation of their profit sharing agreement. That likelihood is evident from a plain reading of the agreement’s terms, an examination of the ample case law regarding profit sharing agreements, a rudimentary knowledge of economics, and an analysis of the “circumstances, details, and logic” of the agreement. In the absence of a procompetitive justification that outweighs the likelihood of substantial anticompetitive effects, I conclude with confidence and even with certainty that the profit sharing agreement violates § 1 of the Sherman Act. I also conclude with the same measure of confidence and certainty that denying California the injunction to which it is entitled, simply because the parties did not engage in an extremely costly, burdensome, and utterly unnecessary battle of economic experts under rule of reason review, is contrary to the fundamental policies underlying our antitrust law, and encourages future antitrust violations by these defendants and others who may seek to suppress the rights of their employees.
Accordingly, I dissent in part.

. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) ("The end sought [by Congress in passing the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.”); see also Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.”); City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 398, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (In passing the Sherman Act, Congress "sought to establish a regime of competition as the fundamental principle governing commerce in this country.”).

. Defendants also contend that their profit sharing agreement is exempt from the antitrust laws because they employ it as a bargaining tactic in an anticipated labor dispute. The majority concludes that the profit sharing agreement does not qualify for the nonstatutory labor exemption and I agree. See Maj. Op. at 1124-32.

. Inherent in the summary nature of quick look and per se analysis is the possibility that a restraint that would survive a full rule of reason analysis in a particular case will nonetheless be invalidated: "For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable.” Maricopa Cnty. Med., 457 U.S. at 344, 102 S.Ct. 2466. The ultimate inquiry in both analyses is establishing a sufficiently high likelihood of anticompetitive effect to justify foreclosing, in the name of certainty and efficiency goals, the possibility that a more in depth review would reveal that a restraint was on balance benign or even beneficial. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 340 n. 10 (2d Cir.2008) (Sotomayor, J., concurring in the judgment) (quick look and per se *1147 "methods of analysis are reserved for practices that 'facially appear [] to be one[s] that would always or almost always tend to restrict competition and decrease output.’ ") (alterations in original) (quoting Broad. Music, Inc. v. CBS, 441 U.S. 1, 19-20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)).

. I note that the district court should not have accorded the expert's statement any weight given its explicitly speculative nature. "An expert's opinions that are without factual basis and are based on speculation or conjecture” are inadmissible at trial and are "inappropriate material for consideration on a motion for summary judgment.” Major League Baseball, 542 F.3d at 311.

. This effect has been well understood for many years, and was ably explained well over a hundred years ago by the Kentucky Court of Appeal, then the highest court in that state, in the following discussion of a profit sharing arrangement between two steamboat companies:
There was a strong stimulation to increase the net profits by means other than that of popular favor springing out of efficient steamboat facilities and close attention to the business of shipping for reasonable charges and courteous attention to passengers at reasonable fare____ It is the competition, or fear of competition, that makes these carriers efficient, attentive, polite, and reasonable in charges. Remove competition, or the fear of it, and they become extortionate, inattentive, impolite, and negligent. ... It is said that neither was bound to charge the same as the other. That is true; but either could extort with impunity, and the other would be an equal recipient of the fruit of the extortion.... It is true that their contract did not, in so many words, bind them to any given charges; but it made it to the interest of each, not only to charge, but to encourage and sustain the other in charges that would amount to confiscation. ... This combination was more than that of a combination not to take freight or passengers at less than certain prices. In such case, the combiners have to furnish adequate means of transportation, and efficient and polite officers, and confine themselves as nearly as possible to the sum agreed upon, in order to secure the trade, or a reasonable portion of it; but here, by reason of the agreement,.... [inefficient means of transportation [and] unskilled or inattentive officials [] are no drawback to either boat. Its share of the profits come[s] notwithstanding.
Anderson v. Jett, 89 Ky. 375, 12 S.W. 670, 671 (1889).

. IIA Areeda & Hovenkamp ¶ 391b(l) at 323 ("[W]hether a price-fixing conspiracy among sellers involves everyone or only a dominant group, this business practice leads to overcharges that constitute antitrust injury. The same can be said for business practices that are economically equivalent — for example, agreements on market division, product quality, credit terms, and the like.”).

. No precise standard exists for determining when a firm or a group of firms controls enough of a market that its actions might cause anticompetitive effects. However, the uncontested facts about defendants’ share of the market and the fragmented nature of the rest of the market together appear to be sufficient to establish the monopoly power over the market required for a violation of section 2 of the Sherman Act, a higher standard than is required to find that a firm or firms had sufficient power in the market that their actions could violate section 1. See Am. Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct 1125, 90 L.Ed. 1575 (1946) (a firm with over two-thirds of the market is a monopoly); Syufy Enters, v. Am. Multicinema, Inc., 793 F.2d 990, 995-1000 (9th Cir.1986) (60-69% market share accompanied by a fragmentation of competition sufficient to show "monopoly power” over a market as required for violations of section 2 of the Sherman Act); Pac. Coast Agric. Exp. Ass’n v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir.1975) (45-70% share of the market sufficient to show monopoly power where no other competitor had more than a 12% share); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (“Monopoly power under § 2 requires, of course, something greater than market power under § 1.”); cf. FTC v. Staples, 970 F.Supp. 1066 (D.D.C.1997) (applying 1982 Merger Guidelines); Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 896 (9th Cir.2008) ("When firms in a market are able to coordinate their pricing and production activities, they can increase their collective *1155 profits and reduce consumer welfare by raising price and reducing output.”) (citing George Stigler, A Theory of Oligopoly, 72 J. Pol. Econ. 44 (1964) (arguing that successful collusion requires firms to overcome particular market uncertainties; one of the key uncertainties is whether another firm will "cheat” its rivals by offering a lower price)); United States Energy Information Administration, World Crude Oil Production, 1960-2008, http://www.eia.doe.gov/aer/txt/ptbl 105, html (last visited June 13, 2009) (during the 1970s OPEC never controlled more than 56% of the world oil market).

. Another consideration is that many alleged competitors’ product offerings differ substantially from those of defendants, including box stores selling goods in bulk, such as Costco; retailers selling a limited selection of products and brands, such as Trader Joe’s; and stores specializing in organic foods, such as Whole Foods. These markets are by their nature incapable of competing for much of the business of traditional supermarkets such as those operated by defendants. Notwithstanding these obvious facts, Costco, Trader Joe’s, and Whole Foods were each alleged by defendants to have placed competitive pressure on them during the labor dispute.

. Interestingly, economic theory suggests an even stronger negative effect on competition: it would appear to predict that, at least in the short run, in a market in which large, dominant firms have an agreement limiting competition amongst themselves, such an agreement will tend to increase the prices charged by those large firms, and that smaller firms, rather than increasing whatever economic pressure they ordinarily exert on those larger firms by charging the lower prices that would obtain under competitive conditions in order to attract the larger firms’ customers, but will instead charge higher prices close to those being charged by the larger firms. See Herbert Hovenkamp, Federal Antitrust Policy § 4.1b (1994). Firms that pool profits are acting as a kind of cartel, and cartels that do not contain all the firms in the market are still able to raise prices above the prices that would be observed in a competitive marketplace, especially in a short term situation like that present here, in which the fixed costs of starting a supermarket (leases, employment and product purchasing contracts, signage, etc.) make it unlikely that new firms would enter the market to take advantage of the prices that are artificially high due to the cartel’s collusive behavior. See Dennis W. Carlton & Jeffrey M. Perloff, Modem Industri *1156 al Organization 107-15, 122 (3d ed.2000). Additionally, fixing market shares at precartel levels, as defendants essentially did here, is an “effective technique” for preventing cheating (in the form of competitive behavior) among members of the cartel. See id. at 139-40.

. A more urgent financial condition would appear, if anything, to make it less likely that defendants would commit resources to competing with each other for customers from whom they would receive profits, if at all, only at some future date. To any extent that lower demand, lower supply, or strike-caused financial woes would prompt a defendant to try to win customers from vendors external to the agreement, the profit sharing agreement would, as in a nonstrike period, reduce its incentive for doing so: while the defendant would pay the entire cost (in advertising, improved quality, or discounting) of luring such customers, it would retain only a fraction of the benefit generated equal to its prestrike share of the market, and a substantial number of the new customers might well, for reasons discussed earlier, be lost by the time the labor dispute and profit sharing ended.

. The obviously anticompetitive nature of defendants’ profit sharing agreement in a traditional market setting distinguishes it from the restraint in California Dental Association. Here, there is a long history of adjudging profit sharing agreements to be anticompetitive and of demonstrating the validity of that conclusion. The unique limits on price and quality advertising by dentists that were at issue in California Dental Association might have been thought by some to reduce incentives to compete over price or quality, because without such advertising it would be difficult for a dentist to inform potential customers about his advantages over his competitors and, thus, lowering his prices or expending resources to improve his quality might simply have reduced his profits from existing customers. However, the Court reasoned that the nature of the market for "professional services” such as dental care was unique and that the circumstances made it difficult to compare services across providers and to verify price and service information, meaning that price and quality advertising might have been misleading, and misleading advertising itself poses dangers to competition. See Cal. Dental Ass’n, 526 U.S. at 771-72, 119 S.Ct. 1604. Accordingly, the Court concluded, that because of the "professional context,” it was not implausible that, as a theoretical matter, the restriction on price advertising had either a positive effect or no effect on competition. See id. at 774-75, 119 S.Ct. 1604. The Court emphasized that theoretical claims of anti-competitive effects that are not evident or established in antitrust law must be carefully considered and clearly explained in order to justify shifting the burden to defendants to show some procompetitive effect. See id. at 775 n. 12, 119 S.Ct. 1604. Here, the subjective factors that the Court found were critical to the sale of professional services do not exist. Economic theory as well as a practical analysis of the factual circumstances make it clear that there is a high likelihood that the profit sharing agreement had anticompetitive effects. Unlike California Dental Association, there is a clear theoretical basis for concluding that a profit sharing agreement would have anticompetitive effects, and, again unlike California Dental Association, there is no plausible basis, theoretical or otherwise, for concluding that the profit sharing agreement had procompetitive effects, see infra section IV. 2. Accordingly, the burden to demonstrate evidence of the restraints' procompetitive effects falls on defendants, who do not meet it in any way.

. Defendants’ evidence purporting to show that employees charged with pricing during the dispute did not know about the profit sharing agreement and took no action because of it, which was relied upon by the district court, also fails to provide support for their contentions. Their evidence on this point is both skeletal and somewhat dubious. Defendants do not come close to demonstrating that all employees with power over pricing were ignorant of the agreement or took no action because of it. See, e.g., Declaration of Bryan Davis ¶ 3 (Albertsons employee describing himself as responsible only for the prices in a discreet category of groceries); Declaration of Carla Simpson ¶ 2 (Safeway employee describing herself as having responsibility only for implementing pricing established by another department). Moreover, early in the strike the Los Angeles Times published a front-page article revealing that the chains had agreed to share the financial burden of the strike. See Nancy Cleeland & Melinda Fulmer, In Tactical Move, Union Pulls Pickets From Ralphs, L.A. Times, Nov. 1, 2003, at Al. More important, it would defeat entirely the efficiency goals underlying the existence of per se, quick look, and “meet for the case” analysis if defendants could preclude a summary finding, and proceed to full rule of reason analysis, simply by asserting that the employees in charge of pricing did not know about the profit sharing. Such assertions are easy to make, while proving or disproving who knew what, and whether the knowledge of a particular individual had any effect on whether the company acted in a competitive manner, would require exactly the sort of onerous and costly production of evidence that summary review is meant to avoid. In any case, as noted above, the quick look inquiry is a probabilistic one: in order to place the burden on defendants to demonstrate that the agreement had a procompeti *1160 tive effect, California need prove only that defendants’ agreement to share profits created a great likelihood of anticompetitive effects. Accordingly, even if the anticompetitive effects had not come to pass because certain employees did not learn of the agreement or did not correctly calculate where the company’s interests lay in light of the agreement, that fact would be immaterial to the result of our inquiry.

. “One of the important social advantages of competition mandated by the antitrust laws is that it rewards the most efficient producer and thus ensures the optimum use of our economic resources. This result, as Congress [has] recognized, is not achieved by creating a situation in which manufacturers compete on the basis of who pays the lowest wages.” United Mine Workers of Am. v. Pennington, 381 U.S. 676, 724, 85 S.Ct. 1607, 14 L.Ed.2d 626 (1965) (Goldberg, J., dissenting and concurring); see also 15 U.S.C. § 17 (“The labor of a human being is not a commodity or article of commerce.”); Polygram Holding, Inc. v. FTC, 416 F.3d 29, 38 (D.C.Cir.2005) ("A restraint cannot be justified solely on the ground that it increases the profitability of the enterprise....”); Law v. NCAA, 134 F.3d 1010, 1023 (10th Cir.1998) (”[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws.”). Depressing wages is not of societal benefit; it simply harms working people and their families, a significant part of the group that has come to be known as "the middle class,” and which is experiencing enough economic travail without the added unlawful actions of those conspiring to violate the antitrust laws.